UNITED STATES of America,
Plaintiff–Appellee,

v.

Alan S. AGNEW, Defendant–Appellant.

No. 90–1077.

United States Court of Appeals,
Tenth Circuit.

April 29, 1991.

Vicki Mandell–King, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colo., for defendant-appellant.

Linda Kaufman, Asst. U.S. Atty. (Michael J. Norton, U.S. Atty., with her on the brief), Denver, Colo., for plaintiff-appellee.

Before McKAY and ANDERSON, Circuit Judges, and CHRISTENSEN, District Judge[*].

CHRISTENSEN, District Judge.

Appellant Alan S. Agnew was found guilty by a jury on one count of a multi-count indictment charging sales and distribution in commerce of adulterated ground beef in violation of the Federal Meat Inspection Act, 21 U.S.C. §§ 601(m)(3), 610 and 676(a). He appeals claiming (1) the statute on which his felony conviction was based is unconstitutionally vague as applied; (2) the district court erred in failing to instruct the jury that specific intent, as distinguished from general intent, was a necessary element of the offenses charged; (3) it erred in admitting testimony and photographs of the condition of the meat after the January 15, 1988, sale on which defendant's conviction was based, and (4) it erred in giving with reference to the dates of the alleged offenses an "on or about" instruction. We affirm.

## STATEMENT OF THE CASE

The original indictment contained three counts, each alleging that Agnew on or about respective dates sold adulterated meat contrary to the statute. A superseding indictment, also in three counts, was returned by the grand jury to render clearer the government's intention to charge the commission of felonies rather than misdemeanors by referring specifically to "the distribution and attempted distribution," as well as sales in commerce, of adulterated meat.[1] To aid in elucidating our view of

---

[*] A. Sherman Christensen, Senior Judge, United States District Court for the District of Utah, sitting by designation.

1. The first two counts referred to sales to Steele's Market, Inc., between December 8 and 9 and December 9 and 10, 1987, respectively. The trial court was of the view that since both deliv-

significant points at issue, we set out in the margin the pertinent provisions of the statute.[2]

The two counts submitted in the court's charge to the jury at the close of a three-day trial were identical except for times, places and vendees, the one on which conviction was had reading:

On or about January 15, 1988, within the State and District of Colorado, ALAN AGNEW, defendant, sold and offered for transportation in commerce meat and meat food product, specifically, ground beef, to B.W. & A., Inc., located at 6308 E. 72nd Avenue, Commerce City, Colorado, which was capable of use as human food and was adulterated, as defined in Title 21, United States Code, Section 601(m)(3) because the meat and meat food product consisted in whole and in part of putrid and decomposed substance, and was unsound, unhealthful, unwholesome, and otherwise unfit for human food, and this violation involved the distribution and attempted distribu-

tion of adulterated ground beef; all in violation of Title 21, United States Code, Section 601(m)(3), 610 and 676(a).

The defendant before trial moved the district court to dismiss the indictment as a whole on the ground that the statute upon which it was based was unconstitutionally vague on its face and as applied. After hearing, the court denied the claim of facial vagueness, and defendant does not complain of this, but reserved ruling on the contention of vagueness as applied until completion of the trial evidence. Defendant filed also a motion in limine for the suppression of photographs of meat taken by an inspector of the Department of Agriculture and testimony concerning his observations. Ruling was reserved on this motion also, but during trial the court admitted the questioned evidence.

■ Included in the court's charge were the following instructions to some of which defendant's counsel had interposed objec-

---

eries of the sold products were the result of a single conversation between the defendant and the purchaser, the defendant properly could be charged with only one related offense, and the first two counts accordingly were submitted to the jury as one.

**2.** § 601. *Definitions*

As used in this chapter, except as otherwise specified, the following terms shall have the meanings stated below:

. . . .

(k) The term "capable of use as human food" shall apply to any carcass, or part or product of a carcass, of any animal, unless it is denatured or otherwise identified as required by regulations prescribed by the Secretary to deter its use as human food, or it is naturally inedible by humans.

. . . .

(m) The term "adulterated" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:

(3) if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food; . . .

§ 610. *Prohibited acts*

No person, firm, or corporation shall, with respect to any cattle, sheep, swine, goats, horses, mules or other equines, or any carcasses, parts of carcasses, meat or meat food products of any such animals—

. . . .

(b) sell, transport, offer for sale or transportation, or receive for transportation, in commerce, (1) any such articles which (A) are capable of use as human food and (B) are adulterated . . . at the time of such sale, transportation, offer for sale or transportation, or receipt for transportation; . . .

§ 676. *Violations—Misdemeanors; felonies: intent to defraud and distribution of adulterated articles; good faith*

(a) Any person, firm, or corporation who violates any provision of this chapter for which no other criminal penalty is provided by this chapter shall upon conviction be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; but if such violation involves intent to defraud, or any distribution or attempted distribution of an article that is adulterated (except as defined in section 601(m)(8) of this title), such person, firm, or corporation shall be subject to imprisonment for not more than three years or a fine of not more than $10,000 or both; *Provided,* That no person, firm, or corporation, shall be subject to penalties under this section for receiving for transportation any article or animal in violation of this chapter if such receipt was made in good faith unless [there is a refusal to furnish to the Secretary certain information and documents on request].

tions during earlier conferences among court and counsel for reasons relied upon in this appeal:[3]

No. 7: You will note that the indictment charges that the offenses were committed "on or about" a certain date. The proof need not establish with certainty the exact date of the alleged offenses. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

No. 20: The crimes charged in this case require proof of intent before the defendant can be convicted. To establish intent, the Government must prove that the defendant knowingly did an act which the law forbids. Such intent may be determined from all the facts and circumstances surrounding the case.

No. 21: An act is done knowingly if the defendant is aware he is performing the act or the act is done voluntarily. An act committed with reckless disregard or indifference for the truth is committed with knowledge. An act done because of mistake or accident or other innocent reason is not done knowingly.

As stated before, with respect to an offense such as the one charged in this case, knowledge must be proved beyond a reasonable doubt under all the facts and circumstances in this case before there can be a conviction.

No. 26: The term "adulterated" as used in Counts I and II in this case shall apply to any meat or meat food product if it consists in whole or in part of any filthy, putrid or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food.

No. 27: The words "filthy," "putrid," "decomposed," "unsound," "unhealthful," "unwholesome," and "unfit for human food," as used in these instructions are used with their usual and ordinary meaning and should be applied by you.

R. Tr. Vol. VI, 475, 481–84.

The jury returned a verdict of not guilty on consolidated Count I and guilty on Count II. The district court fined the defendant $500.00 and granted him probation for a period of three years.

## FACTS

The appellant does not question the sufficiency of the evidence to support the guilty verdict apart from the other points raised on this appeal. The critical evidence is largely undisputed except for the defendant's denial that he had knowledge of the adulterated condition of the meat before and at the time of its sale to B.W. & A., Inc., on January 15, 1987.

Mr. Agnew at the time was employed as meat buyer for Nash–Finch Company, a Denver wholesaler in grocery products. He had held numerous positions in the meat industry, beginning when he was twelve or thirteen years old. As meat buyer, he was responsible for purchasing for his company meat products which ordinarily he would arrange to sell to retail grocers. Most of his negotiations were done by phone. He had the authority to decide what meat to buy, and from whom and when, and to negotiate prices. He also had authority to determine to whom to sell. When meat was returned to Nash–Finch under a claim of being unfit for sale, the

---

**3.** The record discloses no exception to the court's charge after it was given. Fed.R.Civ.P. 51 provides in part: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matters objected to and the grounds of the objection...." Fed.R.Crim.P. 30 contains identical language except for substitution of the phrase "any portion of the charge or omission therefrom" for the phrase "the giving or the failure to give an instruction." In *Dunn v. St. Louis–San Francisco Ry. Co.*, 370 F.2d 681 (10th Cir.1966), this court read the rule as commending, if not requiring, exceptions to be taken following the giving of instructions, a view which has been criticized. *See United States v. Phillips*, 869 F.2d 1361, 1368–69 (10th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989). In any event, defendant's counsel clearly met even "the heavy burden" recognized by *Dunn*, 370 F.2d at 684, to show that any advance objections to the charge were made "with sufficient specificity and distinctness," this of course being the heart of the rule.

defendant was responsible for deciding whether it should be destroyed or resold.

On November 18, Agnew learned that a shipment of coarse ground beef from Iowa Beef Processors (IBP) was available for purchase. The meat had been ordered by Albertson's but was rejected without reference to its condition because it arrived a day late. The 470 cases weighing 44,219 pounds would have cost Albertson's $.87 per pound. Agnew purchased it for $.85 per pound. The policy at Nash–Finch was to sell coarse ground beef within twelve days of its date of pack. The meat had been packed by IBP on November 13 and 14 and was so marked. It also bore the USDA inspection stamp. Agnew proceeded to distribute it.

He received notice from retailers on December 3 and 4 that the product was discolored and gassy. He attempted to contact an IBP representative on December 4, but was unable to reach him. However, despite his concerns, he sold ten ninety-pound boxes each to two different Sax Food Stores on December 5.

On December 7, Agnew sold twelve additional boxes to Sunshine Super in La Junta, six boxes to Johnson's Super Foods in Fort Morgan, ten boxes to Sax Food Store #101 in Lafayette, twenty boxes to Sax Food Store #102 in Colorado Springs, ten boxes to Sax Food Store #103 in Aurora, and six boxes to Sax Food #104 in Arvada.

In each instance, a good portion of the meat was returned because store managers determined it was not fit to be sold for human consumption. Dale Casebolt of Sunshine Super had purchased the meat after Agnew told him that he was "long on meat" and needed help. When Casebolt, then a veteran of thirty-nine years in the business, told the defendant he was returning the meat, he indicated that his customers had complained of its bad, gassy condition. When the product was returned to Nash–Finch, the box numbers were recorded and credit memoranda indicating "N" next to each returned box were written. The "N" indicated that the meat had been returned because of its bad condition

and was not to be resold without the meat buyer's approval.

On December 8, the defendant phoned Robert Vlasman, meat manager at Steele's Market in Fort Collins. He told Mr. Vlasman that he could sell him coarse beef for the sale price of $.65 per pound and that the meat had some age on it. Mr. Vlasman agreed to purchase about 105 boxes which were shipped on December 9 and 10. The meat the defendant sold Vlasman was the same meat which had just been returned by Sax #101, #102, #103, #104, and Johnson's Super Foods. Agnew did not tell Vlasman that the meat had already been returned by various stores, several of which had had customer complaints. Vlasman examined the meat and found it to be bloated, gassy and sour. He told Agnew that it was "junk" and that he would not sell it to his customers and therefore returned it for credit.

The returned meat was frozen. Agnew then sold over 9000 pounds in 106 cases at $.35 per pound on January 15, 1988, to Bob Burns Brenton who operated B.W. & A., a discount store handling "surplus" goods. The defendant told Brenton that he was selling the meat "as is" and that "most of it" was salable, and it was understood that Brenton would look through the product and determine what he could sell. Agnew testified that he did not intend that any bad meat would go out to customers.

When sold by Agnew, the meat was still packaged as it had been at IBP, that is, with fifteen-pound vacuum packed "chubs," in boxes bearing the "USDA-inspected" label. Brenton noticed that the boxes were well worn, blood stained, and contained many chubs which were bloated. This was Brenton's first purchase of ground beef from the defendant. He discarded approximately 1000 pounds before he placed the remainder in his freezer. He later sold portions of this remainder to a restaurant, a catering service, at flea markets and at auctions.

Several weeks later, Edward Carr, Compliance Inspector for the U.S. Department of Agriculture, received complaints from people who had participated in an auction

of some of the meat that Mr. Brenton had distributed questionable meat. On February 17, Carr located the forty-six remaining boxes of the meat in a freezer at B.W. & A. He was able to trace the history of each box by comparing the orange Nash–Finch sticker bearing a five-digit number with the sales and return invoices received from Nash–Finch. Carr had been a meat inspector of eleven years with the Department of Agriculture. He observed that the meat was discolored, gassy, bloated, sour smelling, rotten, and clearly not fit for human consumption. He testified that when meat decomposes, bacteria multiplies causing it to become gaseous. The process of decomposition is slowed by freezing but not stopped or reversed. He took photographs of the boxes of meat found in the freezer.

## I

Appellant contends that in three respects the statute under which he was convicted is unconstitutionally vague as applied: (A) The term "adulterated" is vague as applied to the circumstances of this case; (B) the statute is unconstitutionally vague as applied to "salvage"; and (C) its felony provision is unconstitutionally vague.

## A

■ To comply with the Due Process Clause of the Fourteenth Amendment, it is requisite that a penal statute give fair notice to ordinary people of what conduct is prohibited in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

■ Although a statute's meaning may be plain on its face, it can be unconstitutionally vague in application. Whether a statute has been rendered unconstitutionally vague in its application is an issue of law

and the standard of review is therefore *de novo*. *United States v. Protex Industries, Inc.*, 874 F.2d 740, 743 (10th Cir.1989).

The appellant emphasizes that especially if no "scienter" requirement is incorporated in the statute and a felony is charged will the court critically examine the specificity of the statutory language, citing *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *United States v. Gaudreau*, 860 F.2d 357 (10th Cir.1988), and other cases.[4]

■ It is true that in more questionable situations the Supreme Court and we have given weight to the matters of required scienter and the seriousness of penalties in relation to the problem of vagueness. But in no such instance has there been considered such a commonly understood term in such additionally clarifying context and the meaning of which is so clearly encompassed in application as we deal with here. Our attention has been called to no case, nor has our research disclosed one, where the term "adulterated" in context comparable to the present has been held to be unconstitutionally vague. These other considerations relied upon by appellant may serve to render vagueness more significant where it might otherwise exist. But here we see no borderline problem where resort to these factors is critical. Nor do we accept appellant's assumption that no clarifying "scienter" whatsoever can be found in the statutory requirements, for reasons to be discussed later. On the other hand, we find *United States v. Cattle King Packing Co., Inc.*, 793 F.2d 232, 238 (10th Cir.), *cert. denied*, 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986), accepting as it did without question the term "adulterated meat" as its predicate, to be singularly in point on facts held sufficient to sustain a felony conviction.[5]

---

**4.** In some of these, and in *Village of Hoffman,* 455 U.S. at 499, 102 S.Ct. at 1193, recognition in evaluation of clarity is given also to the important factor of whether the statute threatens to inhibit the exercise of constitutionally protected rights such as the right of free speech. Such consideration has no relevancy in this case.

**5.** In count IX, the defendants were charged with shipping adulterated meat products to California Provisions on August 10, 1983. The evidence concerning this transaction is that the meat in question was first shipped by Cattle King to a company in North Carolina, which company rejected a big part of the

The Federal Meat Inspection Act defines "adulterated" by simple terms: "filthy," "putrid," "decomposed substance," "unsound," "unhealthful," "unwholesome," "unfit for human food." The trial court appropriately referred to them as "commonly used [and] easily understood." R. Tr. Vol. V at 356. Notwithstanding testimony that it is sometimes difficult to tell in all instances whether meat is good or bad because some indicia may change or be misleading, the circumstances shown by the record leave little room for questioning the applicability of the definition to the meat sold by Agnew to B.W. & A., Inc. Agnew acted upon the basis of rather clear notice, rather than merely at his peril, in a situation otherwise described in *Gaudreau*, 860 F.2d at 363, n. 17, quoting *Nash v. United States*, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913):

> Laws cannot define the boundaries of impermissible conduct with mathematical certainty. "Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, and if he does so it is familiar to the criminal law to make him take the risk."

■ There is a presumption of validity attaching to acts of Congress. "Statutes are not to be automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within the language." *United States v. National Dairy Products*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). As was said in *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952), "most statutes must deal with the untold and unforeseen variations on factual situations and the practical necessities of discharging the business of government inevitably limit the specificity with which legislatures can spell out prohibitions."

We reject the suggestion of appellant's counsel during oral argument that there should have been some quantitative indication by which better to measure the extent of adulteration which Congress intended to proscribe. Any adulteration of substantial degree obviously was intended to be reached by the Act. We have searched our minds in vain for a brighter line around what obviously was intended to be prohibited and which would not invite attempts to avoid purpose and meaning on the basis of technicalities. To further pursue such an attempt would be an exercise of superarrogation. The framing of a both meaningful and practical definition was the responsibility and prerogative of the Congress; ours is only to review the result for constitutional validity.

It is true that some of the descriptive words standing alone might have an unacceptably broad meaning falling on either side of the line. "Unsound" meat out of context might have little to do with the unhealthful or unfit condition of food for human consumption. As part of the definition, however, and in connection with other correlative conditions ending with the phrase "or otherwise unfit for human food," the purpose, intent and meaning seem about as clear as language practicably permits for application to the type of meat the evidence tended to show defendant knowingly sold.

While the various terms are used in the disjunctive and are to be understood accordingly, there is nothing in this limited application of the principle of *ejusdem generis* inconsistent with *United States v.*

---

shipment because of spoilage. The rejected meat was returned to a Cattle King storage facility in Nebraska, and from there shipped to California Provisions. Witnesses Coffey, Randall, Kim Gillespie, Wilson, and Stephenson testified about this particular transaction. For example, Wilson, the trucker who picked up the meat sold to California Provisions from the Nebraska ice house, testified that the meat was packed in dilapidated boxes and that it "had a funny-looking color and it just—it had a bad smell to it." Also, Stephenson, an employee of S & L Meats, the company which purchased the Cattle King meat from California Provisions, testified that when he received the meat from the trucker, it looked bad, and when the meat was thawed, it was spoiled and unfit for human consumption.

*Cattle King Packing Co.,* 793 F.2d at 238.

*Wiesenfeld Warehouse Co.*, 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964). There, the lower court had resorted to this principle in reading together unrelated provisions of a statute to find a vagueness the Supreme Court rejected. In principle, this decision supports the government's position here because it accepted without question the term "adulterated" in the Federal Food, Drug and Cosmetic Act in language quite similar to that of the Federal Meat Inspection Act, and it emphasized in another connection consumer protection as justification for expansive interpretation.[6]

A search of legislative history rarely throws additional light upon the question of whether a statute is reasonably understandable by ordinary persons. Nor has it done so here, except for its recognition of the long understood meaning of the term "adulterated" and the commensurate collection in one extended definition of various factual illustrations of its basic concept.[7]

We now explicitly hold, in harmony with the view implicit in long and generally accepted usage, in the commonly accepted meaning of the descriptive words used, and guiding legal principles, if not in *Cattle*

*King* itself, that the term "adulterated" as applied in the circumstances of the present case is not unconstitutionally vague.

## B

We find no merit in appellant's next contention that the statute as applied is unconstitutionally vague because it does not define the term "salvage," or sufficiently specify applicability of its prohibitions, to "salvage sales." ·

The term salvage is not used in the Act. Agnew seeks to render it critical by the circumstance that after the meat had been rejected by others he sold it to Brenton of B.W. & A., Inc., a so-called salvage dealer, "as is," with the claimed expectation that Brenton would segregate the bad from the good before he sold the latter part for human consumption.

We reject the theory that there can be such insulation from criminal liability under the Federal Meat Inspection Act. The selling in commerce of any adulterated meat capable for use as human food is prohibited, and this attempted delegation of

It is settled law in the area of food and drug regulation that a guilty intent is not always a prerequisite to the imposition of criminal sanctions. Food and drug legislation, concerned as it is with protecting the lives and health of human beings, under circumstances in which they might be unable to protect themselves, often "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. *United States v. Balint*, 258 U.S. [250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) ]." *United States v. Dotterweich*, 320 U.S. 277, 281 [64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) ]. *Wiesenfeld*, 376 U.S. at 91, 84 S.Ct. at 563. The government without mentioning *Wiesenfeld* cites *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), in support of its alternate theory that this is a case for the application of strict liability. We regard neither case as so mandating for reasons discussed in part II *infra*.

The sections of the Federal Meat Inspection Act with which we are concerned were the result of amendments and renumbering of the original 1907 Act by Public Law 90–201, Dec. 15, 1967. The section-by-section analysis of the

1967 bill contained in Senate Report No. 799, 1967 U.S.Code Cong. & Admin.News 2188 commented with respect to the term "adulterated," inter alia, that "the definition of this term, not heretofore used in the Meat Inspection Act, is discussed in connection with section 12." The analysis in the Senate Report goes on to say that "It is based on the definition of the term in the Federal Food, Drug, and Cosmetic Act and is identical except [there follows exceptions, the most pertinent of which is that] [i]n section 1(m)(3) a reference to 'unsound, unhealthful, unwholesome' conditions are added to incorporate in the definition of 'adulterated' in the new act the terminology used in the present Meat Inspection Act."

According to the Senate Report at another point, in section 12 of the bill the term "adulterated" was substituted in various other provisions of the Meat Inspection Act for "unsound, unhealthful, or otherwise unfit for human food," and similar terminology, referring back to the definitions contained in section 1(m) was used "which would appear to come within the present terminology of the act."

*See* Senate Report (Agriculture & Forestry Committee) No. 799, Nov. 21, 1967 [to accompany S. 2147] 90th Cong. 1st Sess. *reprinted* in 1967 U.S.Code Cong. & Admin.News 2188, 2194–95, 2202.

responsibility to a buyer for the exercise of restraint required by the seller is of no avail, call the buyer a "surplus" or a "discount" dealer or what you will. If the unconditional legal obligation of a meat vendor thus could be transferred to his vendee, along with the adulterated meat, by the simple device of selling it at discounted price "as is," the proscriptions of the statute would be illusionary and its enforcement impossible. Congress did not render the application of the Act unconstitutionally vague by its unwillingness to incorporate, recognize or define such a nullifying exception to the criminal responsibility imposed.

## C

Appellant raises for the first time on this appeal the contention that the felony provision set out at 21 U.S.C. § 676 is unconstitutionally vague as applied; hence, if this contention is to be considered at all, the usual standard for review would be plain error.

The present challenge is twofold: on the ground of confusion structurally, especially because the penalty provision was not made a part of the section creating the offenses charged, and alleged vagueness in application of the words "distribution" or "attempted distribution" in the creation of a felony or a misdemeanor when one or the other of these is involved.

■ Section 676(a), as we have seen, provides that a person who violates any provision of the chapter for which no other criminal penalty is provided shall upon conviction be subject to punishment for a misdemeanor;

> but if such violation involves intent to defraud, or any distribution or attempted distribution of an article that is adulterated (except as defined in section 601(m)(8) of this title) [having no applicability in this case], such person, ... shall be subject to imprisonment for not more than three years or a fine of not more than $10,000, or both.

Developmental history of this legislation provides explanation for the arrangement which appellant considers so unsatisfactory,[8] but which we leave to stand on its own structural clarity. The problem with regard to the meaning of the questioned phrase is more complex.

Appellant "concedes that this is the first time this specific issue has been raised," except "as part of a total attack on the statute" and as to "the question of the meaning of 'distribution' [in relation] to the claim regarding whether the statute is unconstitutionally vague as applied to salvage." Appellant's reply brief at 10.

A further convolution of the problem is defendant's apparent strategy preceding the trial to concede that the "distribution" language of the statute effectively proscribed the acts attributed to him as felonies to emphasize the strictness with which the alleged vagueness of other provisions should be scrutinized.[9]

The government from the beginning argued that "any sale or offer for transportation of adulterated meat in violation of ... Section 610(c) [necessarily] involves distribution or attempted distribution and thus is

---

**8.** The 1967 amendment was designed to change the penalty for most violations of the Federal Meat Inspection Act from a felony to facilitate prosecution and it would authorize disposal of minor violations by warning letter. Senate Report No. 799, *supra, reprinted in* 1967 U.S.Code Cong. & Admin.News, 2188, 2207.

**9.** Defendant, among other things, wrote in support of a pretrial motion to dismiss the indictment:

> No where in § 610 does the word "knowingly" appear. Section 610 appears to be a strict liability statute. Section 676 states that the violation of § 610 is a misdemeanor unless the violation involves intent to defraud, or

any distribution or attempted distribution of an adulterated article. The indictment in this case does not charge an intent to defraud. In the event the government contends the penalty in this case is for a felony, that contention must be based on the claim that distribution or attempted distribution of an adulterated article took place. The word "distribution" is not found in § 610. Only sale, transportation, and receipt for transportation are proscribed. However, factually speaking, when Agnew purchased the meat from IBP and sold it or transported it to Steele's Market and other places, the meat was "distributed."

R. Vol. I, Tab 2 pp. 9–10.

a felony." R. Supplemental Vol. I, Tab. 1 at 7.

The parties finally agreed with the trial court upon the treatment of the penalty provision as a matter of law.[10]

We are not called upon to decide the validity otherwise of this course of the trial agreed upon by counsel with the approval of the trial court.[11]

 While constitutional error of egregious nature or grave import may be reached within the plain error rule, questions of the kind now involved will not be, despite possible constitutional footings. *United States v. Popejoy*, 578 F.2d 1346, 1350 (10th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). *Cf. United States v. Mitchell*, 783 F.2d 971, 975–78 (10th Cir.), *cert. denied*, 479 U.S. 860, 107 S.Ct. 208, 93 L.Ed.2d 138 (1986). We believe that any possible errors here concerning the penalty related primarily to the sufficiency of evidence to establish a distribution or attempted distribution as a predicate for the felony conviction and the decision not to submit this issue to the jury.

The defendant not only waived any related issue of vagueness by failing to raise it but invited the trial court's handling of the entire matter.

Beyond recognition for the reasons stated that this waiver did not carry constitutional implications, we express no view concerning related questions not preserved for this appeal.

## II

 The appellant next contends that 21 U.S.C. § 610(b)(1) requires for conviction proof of "scienter" or "specific intent" and that the court erred in its instruction to the jury that "general intent" was sufficient. This issue involves a question of law and requires *de novo* review.

Prior to the trial and during conferences concerning jury instructions, the government maintained that the case was one of strict liability, relying primarily upon *United States v. Park*, 421 U.S. 658, 670–73, 95 S.Ct. 1903, 1910–12, 44 L.Ed.2d 489 (1975), and *Cattle King*, 793 F.2d at 240. Of the

**10.** Pursuant to the defendant's pretrial position to which reference already has been made, the following occurred in discussions about instructions during the trial:

MS. KAUFMAN [counsel for government]: My feeling is that these crimes are as a matter of law felonies.

THE COURT: And I have essentially ruled as such today. I have ruled as such today.

MS. MANDELL–KING [counsel for the defendant]: And I am not objecting to that. The superseding indictment charges a felony, as far as I am concerned.

THE COURT: That's the reason for putting that language in the superseding indictment. But see the jury doesn't determine the level of the offense. And as you say, it's a question of law, so I think we ought to take it out. I think it's a legal question.

MS. MANDELL–KING: Judge, you are gonna love this. I think we should take the plaintiff's instruction out, but I have submitted my instruction No. 7, deals with what I think the importance of the word "distribution" is in this case.

Instruction conference, Tr. Vol. III at pp. 40–42. (Defendant later withdrew of record its requested instruction No. 7. Defendant's Statement Regarding Additional Instructions, R. Supplemental Vol. I, Tab 3, para. 4.)

**11.** Even in retrospect, it might be arguable that the government was right from the beginning in assuming that the offenses charged in the origi-

nal indictment necessarily involved distributions or attempted distributions, more so in light of the superseding indictment. On the other hand, it seems possible that Congress did not intend the expression "distribution or attempted distribution" to mean precisely the same as "sale or transportation, or receive for transportation, in commerce," because of the former's implication of severalty, its suggestion of increased culpability from the standpoint of public welfare and other considerations. The evidence might have been regarded as establishing distribution or attempted distribution in any sense of the term. The established course of the attempted prior distributions could have been thought to characterize the B.W. & A. sale, or that sale itself, admittedly contemplating a distribution among consumers of at least some of the meat, could have been thought to involve adulterated meat that was indivisible. The decision of court and counsel also touched upon whether any phase of these problems should be submitted to the jury. *Cf. United States v. Industrial Laboratories*, 456 F.2d 908 (10th Cir. 1972), where the companion element of intent to defraud was submitted to the jury, but so imperfectly that a felony conviction was reduced to a misdemeanor by this court. These possible views or problems did not necessarily indicate that the penalty provisions of the Act are vague.

latter decision, it argued that not only was a strict liability instruction given but liability was applied "vicariously" to a corporate officer who did not personally engage in criminal activity.

The defendant contended that the charges were not strict liability crimes and the jury should have been instructed as to a scienter requirement, especially since the charges were felonies. He recognized that the Supreme Court held in *Park* that an individual could be held liable under the statute even if he did not consciously do wrong, pointed out that *Cattle King* dealt with a statute specifying an intent to defraud, and argued that absent such clear indication of legislative intent the court should be reluctant to dispense with a *mens rea* requirement.

In his request no. 3, defendant proposed a jury instruction as to the requirement of knowingly doing an act which the law forbids, "purposely intending to violate the law."

The Supreme Court has characterized the common law distinctions between general intent and specific intent as being the source of confusion and has favored an approach based on legislative intent as to each element of an offense without becoming bogged down with hairsplitting distinctions. *United States v. Bailey*, 444 U.S. 394, 406–07, 100 S.Ct. 624, 632–33, 62 L.Ed.2d 575 (1980). It has been said that *mens rea* is not a unitary concept and a "knowing" state of mind may be enough. *United States v. Freed*, 401 U.S. 601, 612, 91 S.Ct. 1112, 1119, 28 L.Ed.2d 356 (1971).

■ Scienter in its broad sense means knowledge, but has sometimes been used as a word of art connoting willfulness or specific intent to violate a known law. It has long been recognized that there can be various degrees of culpability, and that what intent, if any, is necessary for the violation of a statute is a legislative matter to be determined by the language of the statute and the purpose it was meant to serve. *See United States v. Balint*, 258 U.S. 250, 254, 42 S.Ct. 301, 303, 66 L.Ed. 604 (1922). *See also Morisette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed.

288 (1952), where Justice Jackson masterfully reviewed the spectrum in concluding that the crime of embezzlement was at one extreme end.

■ The trial court in conferences with counsel discussed the possibility that under the Act there could be criminal liability without scienter of any kind in a case where "the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors." *Smith v. California*, 361 U.S. 147, 152, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 (1949). It also considered the possible requirement of specific intent with bad purpose to violate the law in harmony with the result in *Morisette*. The charge to the jury as finally formulated fell between the ends of the scienter spectrum. The trial court told the jury, as we have seen, that the crime charged required proof of intent and that to establish this the government had to prove that the defendant knowingly did an act that the law forbids. We believe the trial court did not err.

No particular degree of scienter is expressly required by the Act nor is any such requirement precluded in terms. Obviously, a kind of knowledge and intent are implicit elements in any sale or transportation, as such. The question of scienter in a case such as this relates most significantly to the character of the meat sold or transported. The very care with which Congress described the term "adulterated" in commonly understood language suggests with respect to that factor, too, it made knowledge of its nature and intentional conduct in view of that knowledge essentials of the offense.

We believe both *Park* and *Cattle King* support the trial court's view. The Supreme Court opinion did not deal with the primary responsibility of the corporation which had already entered a plea of guilty under the Federal Food, Drug and Cosmetics Act for causing interstate food shipments being held in its warehouse to be exposed to rodent contamination. The Supreme Court held, in view of the strong public policy for protecting consumers implicit in the Act, that the liability imposed

upon a principal corporate officer was proper because of his duty to seek out and remedy violations and to implement measures assuring violations would not occur. It was in that context and in view of the misdemeanor charge that the court reaffirmed the position taken in prior cases that "the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors," quoting *Smith v. California*, 361 U.S. 147, 152, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 (1959); *Park*, 421 U.S. at 671, 95 S.Ct. at 1911.

In *Cattle King*, primarily a fraudulent conduct case under the Federal Meat Inspection Act, the instructions on one count involved the latter principle. A corporate officer who had been convicted of a felony claimed that one of the *Park* instructions would have been proper only with respect to a misdemeanor charge. We said in that case that "*Park* clearly shows that an instruction like 42 is proper when the defendant is a corporate officer, and the crime alleged is a violation of some law designed to insure that food and drugs are safe." 793 F.2d at 240.

But the feature of *Cattle King* significant here is that, different from the other counts, in count 9 the defendants were charged and convicted of a felony for shipping adulterated meat products in commerce under circumstances similar to those of the present case. The *Park* principle was not applied as to that count except to the extent of reducing the scienter requirement from one of bad faith or evil mind as the trial court did in the case now before us. The relevant instruction given by the trial judge in *Cattle King* is not set out in our opinion but a purported copy of it, not questioned by appellant, was furnished to the trial court. Apparently the *Cattle King* trial court, with reference to the fraud counts, told the jury that for conviction it would have to find the knowing doing of an act forbidden by the law, "purposely intending to violate the law," whereas with respect to count 9 it charged:

> Before a defendant may be found guilty of the crime charged in Count IX, the prosecution must establish beyond a reasonable doubt that under the statute described in the instructions the defendant was forbidden to do the act charged in the indictment, and that he intentionally committed the act.

Memorandum in Support of Plaintiff's Proposed Jury Instructions and in Response to Defendant's Memorandum Concerning Proposed Jury Instructions, R. Supplemental Vol. I, Tab 1, p. 2, n. 1.

Distinguishable is the decision of this court in *United States v. Industrial Laboratories Co.*, 456 F.2d 908 (10th Cir.1972), where a felony conviction under the Federal Food, Drug, and Cosmetic Act was reduced to a misdemeanor for inadequacy of the trial court's instructions to the jury on the element of intent. We do not deal in the present case with the statutory predicate of "intent to defraud or mislead," as in *Industrial Laboratories*.

Call the knowledge and intent described by the trial court scienter, specific intent or only general intent, we believe the instructions in the present case were in full accord with both the terms and the purposes of the statute. They recognized the necessity of proof of intent and authorized a conviction only if the defendant knowingly did an act which the law forbids—the sale, transportation, or offer for sale or transportation in commerce of adulterated meat as charged—it being required that the forbidden act be done voluntarily, or in reckless disregard or indifference for the truth, and not by accident, mistake or other innocent reason.

### III

 Appellant further contends that the trial court erred in admitting testimony and photographs depicting the condition of the residue of the meat after the January 15, 1988, sale on the grounds that they were irrelevant, without proper showing of chain of custody and prejudicial. We apply the abuse of discretion standard in reviewing the trial court's ruling. *Kloepfer v. Honda Motor Co., Ltd.*, 898 F.2d 1452, 1456 (10th Cir.1990). The question of sufficiency of foundation, relevancy of exhibits,

and weighing of relevancy against possible prejudice are within the sound discretion of the trial court and its rulings will not be disturbed in the absence of a clear showing of abuse. *United States v. Sounding-sides*, 820 F.2d 1232, 1242–43 (10th Cir. 1987).

■ The four photographs, government's exhibits 39, 40, 41 and 44, were admitted in evidence over defendant's objection. They were taken by Inspector Carr at B.W. & A., Inc., on February 17, 1988, immediately preceding the time when the meat was dumped in accordance with routine practice.[12] They depicted portions of the chubs of ground meat and the boxes in which they were contained as observed by Carr on that date.

When the meat was seized, it was packaged in boxes still bearing the U.S. "inspected and passed by Department of Agriculture" circular stamp. It was wrapped and marked like meat commonly sold to the public. The boxes showed pack dates of November 14, 1987, and still bore the orange Nash–Finch stickers attached when the boxes were first received, which numbers Inspector Carr testified could be traced from the sales invoices to retail stores and return invoices from those stores after returned to Nash–Finch.

There was no question but that packages seized from B.W. & A. and observed and photographed by Carr were part of the lot sold to B.W. & A. by Agnew. Brenton testified with reference to the photograph marked Exhibit 39 that the depicted boxes looked the same as they looked when he received them on January 15, 1988. Tr. Vol. V at 253–54. Inspector Carr with reference to this exhibit as well as to exhibits 40, 41 and 44 testified that they reflected the condition of the product as he saw it on February 17, 1988. Tr. Vol. V at 296.

The precise condition of the meat when Carr first saw it was not highly relevant because admittedly it could have further deteriorated between its last sale and the time of seizure. As to the condition of the meat itself, the photographs are quite obscure. They were not inflammatory. They were significant in indicating generally the nature of the packaging and affording structure to Carr's testimony. Neither they nor his testimony added significantly to the history of the meat, its description by others, its repeated rejection by retailers upon the complaint of customers, and other testimony of its condition at or before the time of the last sale. Furthermore, possible changes of condition between the time of sale and its condition depicted by Carr's testimony and photographs were explored on cross-examination.

The court did not abuse its discretion in receiving the questioned evidence, its relevancy not being outweighed by any danger of unfair prejudice, confusion of the issues, or misleading the jury.

IV

There is no merit to the final contention of the appellant that the court erred in giving the "on or about" instruction heretofore quoted.

■ When examining a challenge to jury instructions, the appellate court will review the record as a whole to determine whether they stated the governing law and provided the jury with ample understanding of the issues and the standards applicable, *see Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988), and will consider from the jury's standpoint whether what the jury heard, even though not faultless, misled it in any way. *See Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984). The court will reverse only if, in light of such considerations, any error was prejudicial. *Big Horn Co.*, 852 F.2d at 1271, n. 19.

■ In retrospect, such stock instruction could well have been omitted from the court's charge, since it was clear that the sale and delivery involved in the only count on which defendant was convicted occurred on January 15, 1988. But there was good

---

**12.** No point is or could be made by appellant of this destruction of possible evidence, since Carr did not discover it until the time of his first observation and photographing and it is apparent that the meat or even the packaging could not be preserved indefinitely. *Cf. United States v. Martinez*, 744 F.2d 76, 79–80 (10th Cir.1984).

reason for the instruction to be given with respect to the other count submitted to the jury because the sale agreement was made on one date and deliveries occurred on another. The contention that the instruction with respect to the count on which conviction was had might have led the jury into believing in view of Carr's testimony that the defendant could be found guilty for any deterioration of the meat after January 15, 1988, is fanciful. "The 'on or about instruction' ... has been approved by this circuit on numerous occasions," *United States v. Poole*, 929 F.2d 1476 (10th Cir. 1991), and again involved no prejudicial error here.

## CONCLUSIONS

Numerous other citations and varied argumental nuances have been pressed upon us by diligent and resourceful counsel, but we have deemed it unnecessary to pursue these here to their attenuated end. After full consideration, we are convinced that the Federal Meat Inspection Act is not unconstitutionally vague as has been claimed by appellant, the trial court did not err in the admission of evidence, and its instructions to the jury were not erroneous. The judgment appealed from is therefore AFFIRMED.