In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3361

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAGROU DISTRIBUTION SYSTEMS, INCORPORATED,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 605—**Harry D. Leinenweber**, *Judge.*

ARGUED FEBRUARY 14, 2006—DECIDED OCTOBER 20, 2006

Before BAUER, RIPPLE, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Based on severe rodent infestation and sanitary problems at a LaGrou Distribution Systems warehouse, LaGrou was convicted of three felony counts: the knowing improper storage of poultry products, 21 U.S.C. §§ 458(a)(3) and 461(a) (Count Three); the knowing improper storage of meat products, 21 U.S.C. §§ 610(d) and 676(a) (Count Four); and the knowing improper storage of food products, 21 U.S.C. §§ 331(b), 333(a)(2), and 342(a)(4) (Count Five). LaGrou was sentenced to a five-year term of probation, ordered to pay a total restitution of $8.2 million, jointly and severally with co-defendants, and sentenced with a total fine of $2 million. LaGrou now appeals its

convictions and sentence. We affirm LaGrou's convictions on Counts Three, Four, and Five and its sentence for Counts Three and Four. We vacate and remand the sentence for Count Five.

## I. Background

The conditions at LaGrou's cold storage warehouse at 2101 Pershing Road in Chicago were enough to turn even the most enthusiastic meat-loving carnivore into a vegetarian. The Pershing Road warehouse was a cold storage facility that stored raw, fresh, and frozen meat, poultry, and other food products. LaGrou did not own most of the products that it stored at the facility. Rather, LaGrou's business consisted of storing products owned by its customers. As much as 2 million pounds of food went in and out of the Pershing Road warehouse on a daily basis.

The record is unclear as to how long the rodent problems existed, but based on the trial testimony of LaGrou's manager, David Smith, it is clear that LaGrou was aware of the problem in 1999. In January of 1999, Smith (a co-defendant who pleaded guilty to misdemeanor charges) was hired as the manager of the Pershing Road warehouse. When he started, he noticed a rodent problem at the facility. Specifically, Smith learned that LaGrou workers found rodent droppings and occasionally caught rats in traps throughout the warehouse. Soon after, Smith approached LaGrou's president, Jack Stewart (an individual co-defendant at trial), about the rodent problem at the warehouse. Smith and Stewart discussed the rodent problem about three times per week, with the frequency of these discussions increasing as time went on.

Unfortunately, the rat problem only worsened. According to Smith, in 2001 LaGrou employees were catching more rats and finding more rodent droppings. Smith testified that in late 2001 or early 2002, LaGrou warehouse workers

regularly caught rats (at least one to two rodents per *day*), and discovered rat droppings and rodent-gnawed products in the warehouse. Rodent-damaged product was coming from all over the warehouse, with the bulk of the damaged product coming from the basement. Smith testified that although employees would destroy the product that had been gnawed, LaGrou did not conduct any tests to make sure that other boxes that appeared okay were not similarly contaminated by rodents.

Eventually, the rat problem became so bad that LaGrou assigned warehouse employees to "rat patrols" to search for rats and rat droppings, to put out traps, and to report back about the number of rats they were removing from traps each day. According to trial testimony, at one point the "rat patrols" tallied as many as 50 trapped rats. LaGrou employees even tried various makeshift pest control remedies, including fashioning their own rat traps and pouring papier mâché and brine on the floor of the warehouse.

Stewart and Smith met with representatives from McCloud, LaGrou's pest control company, to discuss the rodent problem at LaGrou's warehouse. Although McCloud recommended that LaGrou make certain changes to the warehouse, including rodent proofing dock doors, cementing holes in walls, and sealing sewer lids, Stewart did not give Smith authorization to implement these recommendations because he concluded that the project was too expensive.

Despite improvised solutions to the rodent problem, the situation at the Pershing Road warehouse worsened. For example, in February 2002, LaGrou had particular problems with rats getting into the beef brisket held in the basement cooler area of the warehouse. LaGrou arranged to ship the beef brisket from its Pershing Road warehouse to its Hammond facility. Before LaGrou shipped the brisket, its employees inspected the boxes, separated boxes that appeared to have rodent damage, and the boxes that

appeared to be undamaged were returned to inventory. But, the LaGrou employees were not completely successful in discarding all of the rodent-damaged product: a driver picking up some of this beef brisket from the Hammond facility refused to take the product because blood was dripping from the boxes and it looked as if the brisket had been "chewed" by rats.

Although LaGrou usually noted product damage on outgoing bills of lading to customers, LaGrou did not tell its customers that the damage was caused by rodents. Instead, LaGrou's practice was to tell the customer that the product had been thrown out because of warehouse damage, such as from torn boxes or forklift mishaps. LaGrou employees started writing "MM" (short for "Mickey Mouse") on outgoing bills of lading to differentiate the rodent damage from other warehouse-related damage. Upon discovering that LaGrou employees were using the "MM" notation for rodent-damaged product, Stewart instructed them to stop doing so because he did not want customers asking what "MM" meant.

Many customers did make claims for damaged product. One customer asked LaGrou if it had a rodent problem because the customer had received rodent-damaged meat from LaGrou's warehouse on several occasions, specifically, boxes with gnaw marks and holes. In response, LaGrou sent a letter explaining that there was a small area of the basement with rodent activity and that it would move the product out of the basement to be stored somewhere else in the facility. Despite the letter, the customer's product was still stored in the basement of the warehouse.

Ronda Dunson, a quality assurance manager for LaGrou customer Aurora Foods, came to the Pershing Road warehouse to check on her products in the spring of 2001. Dunson discovered "excessive droppings," what looked like a feeding area for rodents, ceiling and wall damage, exposed

cork, mold growth, and pest harborage. In later correspondence between Stewart and Aurora Foods, LaGrou refused to pay a claim from Aurora Foods for product damage. Further, Stewart represented to Aurora Foods that the pest control company only "found two totes with old mouse droppings" and "no other signs of infestation," and that a recent American Sanitation Institute ("ASI") inspection did not find any problems. This information provided by LaGrou was not true; as the ASI representative testified at trial, one of the "critical" issues ASI found was rodent activity. Moreover, a report from McCloud, LaGrou's pest control company, had previously informed LaGrou of the vast rodent problems.

On May 25, 2002, Hugh McCauley, a United States Department of Agriculture ("USDA") food safety inspector went to the Pershing Road warehouse. At the time, LaGrou employees were processing hams for freezing without the benefit of USDA inspection. In addition, the hams were uncovered. McCauley notified other USDA officials, and Vella Kay Holmes, a USDA compliance official, went to the Pershing Road warehouse on May 29, 2002. Holmes noticed that in the warehouse freezer where the hams were being stored, the walls were deteriorating, the ceiling and structures were rusty, and the paint was flaking. Holmes was concerned that due to these conditions in the freezer, the hams that had been processed and were uncovered could have been contaminated. Because of these concerns, Holmes detained the hams.

On May 29, 2002, Holmes and McCauley conducted a more detailed examination of the conditions in the Pershing Road warehouse. Holmes observed holes in the walls with glue boards in front of them, fresh rat droppings on the floor of the food storage areas, and a box of beef product that had been gnawed by rats and was dripping blood. Holmes advised Smith that no food products would be allowed to come into or leave the basement of the ware-

house. Holmes also advised LaGrou officials that the USDA inspectors would return the next morning to inspect the entire facility.

After the USDA inspectors left, Stewart advised Smith to start cleaning up the warehouse. Consistent with this discussion, Smith and approximately 20 LaGrou employees cleaned the Pershing Road warehouse and threw out meat, boxes, and pallets.

The following morning, 14 USDA officials arrived at the warehouse to begin an intensive inspection. Prior to arriving at the Pershing Road warehouse, USDA officials advised representatives from other federal, state, and local health agencies about the conditions at the warehouse. As a result, officials from the Food and Drug Administration ("FDA"), the Illinois Department of Public Health, the Chicago Department of Public Health, and the Illinois Department of Agriculture assisted in the inspection. When the officials arrived, they observed and photographed dumpsters and tow bins full of meat, ice, debris, pallets, and packaging material. These findings were discussed with Smith, who acknowledged that he and other LaGrou employees had been there all night cleaning the warehouse in anticipation of the morning's inspection.

According to Dr. Bonnie Rose, the USDA microbiologist who testified, LaGrou's warehouse was the "worst case" she had seen in her 28 years with the USDA. The inspectors found and photographed the following conditions at the Pershing Road warehouse: rat droppings and rat nesting material throughout the warehouse, including next to and on product; rodent-gnawed meat, poultry, and other food products; live rodent sightings; blood from meat product on the floor mixed with rodent droppings and rat tail marks; dirt and debris on meat product; potential rodent access points, including open sewer drains and openings under doors; holes in ceilings, walls, and floors; ice buildup on the

ceilings directly above stored product and water dripping from the ceilings onto the product; mold and filth on the walls and ceilings; several inoperable bathrooms, which forced warehouse workers to use broken toilets and "flush" them with buckets of water; and raw sewage and standing water on the floors.

In addition to the photographs and observations generated by the inspection, representative samples of food products and packaging were collected and sent to the USDA and FDA labs for testing. The testing confirmed adulteration of food products, including rodent gnawing, rodent hair, and rodent feces on several products. Dr. Rose testified that rodents transmit numerous bacterial, viral, parasitic, and fungal pathogens, including E. coli and salmonella. These pathogens could be transmitted by rodent urine, fecal matter, or saliva, or could simply be transported by rodents walking over product. In humans, these pathogens manifest themselves in a variety of illnesses and symptoms, including gastrointestinal, respiratory, or even neurological. Dr. Rose further explained that given the ventilation system in the warehouse, many of these pathogens and viruses, which could survive for months and are not visible to the naked eye, could have become airborne. In addition, leaking roofs, condensation from overhead pipes and ceilings, and dripping pipes could also carry food-borne pathogens.

On May 30, 2002, all 22 million pounds of the meat, poultry, and food products at the warehouse were ordered detained and LaGrou was issued a notice of non-compliance. On May 31, LaGrou's Pershing Road warehouse was shut down. In July 2002, the government filed a civil action seeking to seize and condemn all of the food products stored in the warehouse. The 22 million pounds of food products stored in the warehouse were either destroyed or were subjected to a strict decontamination procedure.

## II. Analysis

### A. Jury Instructions

LaGrou argues that the district judge's jury instructions improperly subjected LaGrou to strict liability for felony offenses. The Court reviews the district court's decision as to jury instructions for abuse of discretion. *United States v. Graham*, 431 F.3d 585, 588 (7th Cir. 2005). We review *de novo* whether an instruction accurately summarizes the law or if it is legally erroneous. *United States v. Stewart*, 411 F.3d 825, 827 (7th Cir. 2005).

Judge Leinenweber instructed the jury that to sustain charges against LaGrou for adulteration of poultry products (Count Three), meat products (Count Four), and food products (Count Five), the government must prove that

> (1) from on or about October 1998 and continuing to on or about May 30, 2002 LaGrou knowingly did any act that had the effect of causing any poultry products, meat products, or food products to become adulterated; (2) the poultry, meat and food products were capable of use as human foods; and (3) the poultry, meat, and food products were being held for sale after transportation in commerce.

In addition, Judge Leinenweber instructed the jury that for Counts Three and Four, the government was required to prove that "defendant's conduct involved either the intent to defraud, or any distribution or any attempted distribution of such adulterated poultry products." For Count Five, the jury needed to find that "defendants committed the act with the intent to defraud or mislead."

The trial judge also gave the jury the definition for "knowingly" from the Seventh Circuit Pattern Jury Instructions:

> When the word "knowingly" is used in these instructions, it means that the defendant realized what he

was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

SEVENTH CIRCUIT PATTERN JURY INSTRUCTION 4.06.

Since LaGrou was a corporate defendant, Judge Leinenweber also gave the jury the Seventh Circuit Pattern Jury Instruction explaining that a corporation acts only through its agents and employees who are authorized or employed to act for the corporation. The district court also instructed the jury that to be qualified as an agent of a corporation, the person must be explicitly or implicitly authorized to act for the principal. Further, an agency relationship may be implied by the conduct, actions, or communications of the principal.

Finally, the judge instructed the jury on the legal definition of an adulterated meat, poultry, or food product:

(1) it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food; or (2) it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.

This definition of adulterated food products is consistent with definitions set forth in the meat, poultry, and food

statutes. *See* 21 U.S.C. §§ 342(a)(3), 342(a)(4), 453(g)(3), 453(g)(4) and 601(m)(4). LaGrou offered a separate jury instruction based on a Tenth Circuit case from 1991. Relying on *United States v. Agnew*, 931 F.2d 1397 (10th Cir. 1991), LaGrou proposed the following jury instruction:

> The crimes charged in Counts Three, Four, and Five require proof of intent before the defendant can be convicted. To establish intent, the government must prove that the defendant knowingly did an act which the law forbids. Such intent may be determined from the facts and circumstances surrounding the case.

Judge Leinenweber rejected LaGrou's proposed instruction because the defendant in *Agnew* was convicted of the *sale* of adulterated beef products, which was a different charge than LaGrou faced.

Contrary to LaGrou's representations, the superseding indictment and jury instructions not only made clear that the jury was required to find that LaGrou (and the agents and employees acting on its behalf) knew that the conditions of the warehouse were insanitary, but also, the jury instructions closely tracked the corporate liability law in the Seventh Circuit. *See United States v. One Parcel of Land Located at 7326 Highway 45*, 965 F.2d 311 (7th Cir. 1992). Judge Leinenweber instructed the jury that

> [a] corporation acts through its agents . . . . [and] 'knows' through its agents . . . To distinguish knowledge belonging exclusively to an agent from knowledge belonging to the corporate principal, courts rely on certain presumptions. Where a corporate agent obtains knowledge while acting in the scope of agency, he presumably reports that knowledge to this corporate principal so the court imputes such knowledge to a corporation.

The instructions in this case explained that in order to convict LaGrou, the jury had to find that an authorized

agent or employee of LaGrou knowingly stored products under insanitary conditions. Since 1999, LaGrou's President, managers, and several employees were aware of the insanitary conditions in the Pershing Road warehouse. LaGrou was aware of the rodent infestation from formal reports, such as from the ASI and McCloud, LaGrou's pest control company, and from informal reports, such as LaGrou employee rat patrols and the employees' necessary sorting of rat-infested product from supposedly clean product.

A crucial charge in these three offenses is that LaGrou *knowingly* stored these products under insanitary conditions, which states the requisite *mens rea* for the charges. We have long held that a court need not recite the differences between general and specific intent. *United States v. Markowski*, 772 F.2d 358, 365 (1985); *United States v. Arambasich*, 597 F.2d 609, 611 (7th Cir. 1979). LaGrou's argument that the prosecutor's passing claim during rebuttal turned the case into a strict liability prosecution is wrong. While the prosecution explained in rebuttal that the quantity of food in this case does not matter, and even went so far as to claim that one bad hamburger would be enough to convict, read in context, the prosecutor's rebuttal responded to an inaccurate claim by LaGrou in closing argument, which incorrectly argued that the government needed to prove that LaGrou stored a specific amount of adulterated food product.

Finally, LaGrou turns to the Supreme Court's recent decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), as support for its contention that the jury instructions did not properly define the requisite intent involved. The argument, however, is misplaced. *Arthur Andersen* involved jury instructions that charged defendants with "knowingly . . . corruptly persuad[ing] another person with intent to . . . cause that person to withhold documents from, or alter documents for use in, an official

proceeding." *Id.* at 703 (internal quotations omitted). In *Arthur Andersen*, the Court held that the instruction failed to convey the requisite consciousness of wrongdoing because it allowed a conviction for an act of persuasion which was itself innocuous and not inherently malign. *Id.* at 703-04. While LaGrou and Arthur Andersen were both charged with corporate liability, the similarities in the two cases end there. Here, LaGrou was charged with knowingly storing meat, poultry, and food products in insanitary conditions. This corporate culpability is a stark contrast to *Arthur Andersen*, where in an obstruction of justice case, the government needed to prove that corporate agents corruptly persuaded others to withhold or alter documents. In this case, the government needed to prove that agents of the LaGrou corporation knowingly stored meat, poultry, and food products under insanitary conditions. LaGrou's president, Jack Stewart, and the Pershing Road warehouse manager, David Smith, were both well aware of the rodent infestation problem and other insanitary conditions at the warehouse, yet persisted in storing and distributing meat, poultry, and food products there. The district court accurately summarized the law and did not abuse its discretion in its jury instructions.

**B. Restitution**

LaGrou next argues that the district court's imposition of the $8.2 million restitution order violated the Sixth Amendment under *Apprendi* and *Booker*, and that the order was not reasonable. *United States v. Booker*, 543 U.S. 220 (2005); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We review a district court's order of restitution for abuse of discretion. *United States v. Chay*, 281 F.3d 682, 686 (7th Cir. 2002).

LaGrou concedes that this Court has consistently held that restitution is a civil remedy, not penal, and therefore the Sixth Amendment and *Booker* do not apply. *United States v. Danford*, 435 F.3d 682, 689 (7th Cir. 2006); *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005). Nonetheless, LaGrou urges us to reconsider this position. We reiterate: restitution is not a penalty for a crime for *Apprendi* purposes since "restitution for harm done is a classic civil remedy" that is administered for convenience by the courts that have entered criminal convictions. *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000). LaGrou gives us no reason to reconsider our well-settled Circuit precedent.

We next consider LaGrou's contention that the district court's restitution order was unreasonable. Based on the horrendous conditions at LaGrou's Pershing Road warehouse, on May 30, 2002, the USDA detained all 22 million pounds of the meat, poultry, and food products on the premises. The evidence at trial and sentencing showed that the conditions on every floor of the warehouse were insanitary and the USDA considered product stored on every floor adulterated. In July of 2002, the government seized and condemned all of the food products stored in the warehouse. Thereafter, the 22 million pounds of food products stored in the warehouse were either destroyed or were treated through strict decontamination procedures.

While LaGrou argues that the infested area was limited to the warehouse basement, the evidence illustrated that the situation at the warehouse was dire. The USDA and other government agencies found dangerous conditions *throughout* the Pershing Road facility. Dr. Rose testified that LaGrou's warehouse was the "worst case" she had seen in her 28 years with the USDA. She further explained that given the ventilation system in the warehouse, the pathogens and viruses could have become airborne. In addition, the leaking roofs, condensation from overhead pipes and ceilings, and dripping pipes found throughout the warehouse could have also carried food-borne pathogens.

In an effort to salvage the products, LaGrou customers worked with scientists and public health officials to create a process to decontaminate or recondition certain food products. This process was performed on products that were in sealed packages that showed no signs of contamination and the process consisted, among other things, of applying a bio fog sanitizing agent to the sealed packages. LaGrou's customers paid over $2 million for this service. As a result of the decontamination process, LaGrou customers were able to salvage over 12 million pounds of products stored at LaGrou's warehouse, and the remaining product was destroyed. The district court ordered LaGrou to pay a total restitution of $8.2 million based on the wholesale price of the 8 million pounds of product that had to be destroyed (approximately $5.5 million), and the cost of reconditioning and decontaminating approximately 12 million pounds of meat, poultry, and food products stored at the warehouse (approximately $2.7 million).

At the sentencing hearing, Judge Leinenweber noted that if the government had not rehabilitated the meat, poultry and food products at the Pershing Road warehouse, they would have destroyed $20 million worth of food. In his opinion, "[i]t certainly was to the benefit of LaGrou . . . to have . . . approximately 12 million pounds of product

rehabilitated at a cost of $2 million." We agree, and therefore conclude that the restitution amount ordered by the district court was reasonable.

## C. LaGrou's Sentence

The district court sentenced LaGrou to a total of $2 million in fines. We review fines imposed on criminal defendants for reasonableness. *Booker*, 543 U.S. at 260-63.

At sentencing, the district court extensively discussed that, under the advisory Sentencing Guidelines, LaGrou's fine could be anywhere from $12 million to $25 million. Pursuant to 18 U.S.C. § 3571, an organizational defendant that has been found guilty of a felony offense may be sentenced to pay a maximum statutory fine of not more than the greater of (a) $500,000; (b) twice the gross gain; or (c) twice the gross loss. 18 U.S.C. § 3571(c)(3), (d). Noting that the Guidelines were advisory, Judge Leinenweber declined to impose a fine within the Guideline range and instead imposed a fine of $2 million. After further discussion from the parties, Judge Leinenweber sentenced LaGrou to a fine of $500,000 on Count Three, $500,000 on Count Four, and $1 million on Count Five—for an aggregate fine of $2 million. As to Counts Three and Four, we find that the sentences are reasonable.

As to Count Five, however, the default statutory maximum was $500,000 but the district court levied a fine for $1 million. The defendant argues that, absent a jury finding beyond a reasonable doubt, the district court had no authority to sentence LaGrou in excess of the default statutory maximum of $500,000. We agree.

The Sixth Amendment requires that any fact (other than the fact of prior conviction) that increases the maximum "penalty" for a crime beyond the prescribed statutory maximum must be proved to a jury beyond a reasonable

doubt. *Apprendi*, 530 U.S. at 490. Here, the problem is that the district court did not give a special interrogatory with the jury instructions or verdict form asking the jury to find a loss amount. Thus, at sentencing, it was the district judge using a preponderance of the evidence standard to find the loss amount, not a jury finding loss amount beyond a reasonable doubt. This is error, and we remand to the district court for resentencing.

Accordingly, while we AFFIRM LaGrou's convictions on Counts Three, Four, and Five, and AFFIRM LaGrou's sentence as to Counts Three and Four, we VACATE LaGrou's sentence on Count Five and REMAND for proceedings consistent with this opinion. AFFIRMED in part and RE-MANDED in part.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*