**Lorraine VILLANUEVA, on behalf of herself and her minor children, Delores Villanueva, Kayla Villanueva, and Esteban Villanueva; Jennie Vasco and Claude Vasco, on their own behalf and on behalf of their minor child, Marie Vasco; Bernadette Villalon, on behalf of herself and her minor children, Jason Villalon and Ian Villalon; and collectively on behalf of all others similarly situated, Plaintiffs,**

v.

**Warren CARERE, President and Member, Board of Education for Pueblo School District No. 60, Dennis Flores, Mary Lou Jackson, Abel Tapia, Judy Weaver, Members, Board of Education for Pueblo School District No. 60; Board of Education for Pueblo School District No. 60, Defendants,**

The State of Colorado ex rel. Gale A. Norton and the Colorado State Board of Education, Intervenors.

Civ. A. No. 94–F–1175.

United States District Court, D. Colorado.

Aug. 24, 1994.

J.E. Losavio, Jr., Margaret L. Herdeck, John W. Fresh, Michael E. Lajoie, Peter Blood, Law Offices of J.E. Losavio, Jr., Christine Pacheco–Koveleski, William W. Barber, Pueblo Co. Legal Services, Inc., Pueblo, CO, for plaintiffs.

Martin Semple, Michael H. Jackson, Franklin A. Nachman, Patrick B. Mooney, Denver, CO, for school district defendants.

Lee R. Combs, Special Asst. Atty. Gen., State Board of Agriculture, Michael W. Schreiner, Asst. Atty. Gen., Human Resources Section, Denver, CO, for State Bd. of Agriculture and R. Shirley.

Silke M. Hansen, Mediator, U.S. Dept. of Justice, Community Relations Service, Denver, CO.

William E. Thro, Asst. Atty. Gen., Colorado Dept. of Law, Denver, CO, for State of Colo.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge.

### I. NATURE OF SUIT AND SUMMARY OF ORDER

This case involves the action by a group of parents to prevent the closure of their neighborhood elementary schools in Pueblo, Colorado. In addition, the parents seek to prevent the opening of a new charter school. This action is before the Court on Plaintiffs' *Motion for a Permanent Injunction.* The parties agreed to consolidate the hearing for a preliminary injunction with that for a permanent injunction. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and FED.

R.Civ.P. 65(a)(2). Defendants have also moved for summary judgment pursuant to Fed.R.Civ.P. 56.[1]

In addition to preliminary statements, the Court has had the benefit of five days of hearings at which the parties presented evidence regarding the events leading up to the decisions to close Hyde Park and Spann elementary schools, the decision to open a charter school, Pueblo School for the Arts and Sciences ("PSAS"); and the impact of these decisions on their children and the community. During these hearings, the Court heard testimony from thirty witnesses including the members of the School Board, District administrators, parents, educators, and experts in sociology and education. The parties have submitted over 200 exhibits, which together with briefs and written closing arguments the Court has thoroughly reviewed.

Plaintiffs in this action are the class of parents of students at Hyde Park Elementary School ("Hyde Park") and Spann Elementary School ("Spann"). In February of 1994, the Board of Education for Pueblo School District 60 (the "School Board") voted to close these schools. Named Plaintiff Lorraine Villanueva is the mother of Delores, Kayla, and Esteban Villanueva. Her children attended Spann. Named Plaintiff Bernadette Villalon is the mother of Jason and Ian Villalon. Her children attended Hyde Park. Defendants Warren Carere, Dennis Flores, Mary Lou Jackson, Abel Tapia, and Judy Weaver are members of the School Board. Mr. Tapia and Mr. Flores are Hispanic. Because Plaintiffs challenge the constitutionality of Colorado's Charter Schools Act (the "Act"), Colo.Rev.Stat. § 22–30.5–101 et seq., the State of Colorado and the Colorado State Board of Education have intervened to defend the Act.

Plaintiffs' Complaint challenges the actions of Pueblo School District 60 (the "District") in closing Hyde Park and Spann and in opening PSAS on the following grounds: (1) the decisions violate Plaintiffs' rights to equal protection of the laws pursuant to the Fourteenth Amendment of the United States Constitution; (2) the Charter Schools Act, facially and as applied, violates the Equal Protection Clause of the United States Constitution; (3) the decisions violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; (4) the school closures would deprive Plaintiffs' rights to due process of law pursuant to the Fourteenth Amendment by depriving them of (a) schoolwide Chapter I benefits, (b) the federally funded follow-through program (PRAISE), and (c) school lunch and breakfast programs; (5) the opening of PSAS violates the Equal Educational Opportunities Act, 20 U.S.C. § 1701 et seq.; and (6) the closure of the elementary schools violates the Elementary and Secondary School Improvement Act Amendments, 20 U.S.C. § 2726, by burdening parental involvement and endangering federal funds contingent upon such involvement.

As relief, Plaintiffs request that the Court enjoin the closure of Hyde Park and Spann. Plaintiffs also request that the Court declare the Colorado's Charter Schools Act unconstitutional. Finally, Plaintiffs seek to enjoin the opening of PSAS.

Having reviewed each of Plaintiffs' claims, the facts as presented during the hearings and in the parties' exhibits, and relevant case law, the Court holds that an injunction is not warranted. All of Plaintiffs' claims and the basis for the Court's decision will be discussed individually. Our jurisdiction will end after entry of this final Order, and the Court will not retain continuing jurisdiction over this litigation. The Court is of the view that implementation of the closure of the two schools and commencement of activity by the PSAS can best be accomplished without court supervision. While we have not granted injunctive relief to Plaintiffs', some actions taken by the District merit comment. To this end, the District should carefully consider the Court's recommendations and observations, discussed below.

## II. BACKGROUND

Pueblo School District 60 is comprised of 23 elementary schools, 6 middle schools, 4

---

1. The Court apologizes for the length of its decision in this matter. Because of the importance of the issues, extensive comment is appropriate.

high schools, an alternative school, and a child care facility. As of October 1, 1993, the District's total enrollment was approximately 18,054 students.

Over the past few years, Pueblo School District 60 has become a national leader in terms of its willingness to pursue innovation in education.[2] In 1991, the District entered into a cooperative agreement with University of Southern Colorado, located in Southern Colorado. This agreement creates the Educational Alliance of Pueblo (the "Alliance").[3] The goals of the alliance are to improve the quality of education at all levels and to better utilize taxpayer dollars through resource sharing. The Alliance is one of the first efforts in the country in which a university and a school district have forged educational and administrative ties. The Alliance was intimately involved with the activities of the District that gave rise to this litigation. Specifically, the Alliance aided in the District's 1991 strategic planning, which began the process leading up to the decision to close Hyde Park and Spann. Furthermore, the Alliance

was named as the sponsor on the charter application of the Pueblo School for the Arts and Sciences ("PSAS").

In December of 1993, the School Board voted to approve the charter school application of PSAS pursuant to its powers under Colorado's Charter Schools Act, § 22–30.5–101 *et seq.* PSAS seeks to address the problems of low test scores, graduation rates, and achievement for Hispanic and minority students by establishing a school with focused curriculum, high expectations, and the insistence that all students complete the same curriculum. Further comment about PSAS is found later in this Order. School Board members Warren Carere, Judy Weaver, Abel Tapia, and Dennis Flores voted in favor of opening PSAS. Mary Lou Jackson voted against the charter school.

On February 23, 1994, the School Board voted four to one to close Hyde Park Elementary and Spann Elementary schools. School Board members Warren Carere, Judy Weaver, Abel Tapia, and Dennis Flores voted for the school closures. Mary Lou Jackson

2. The Court notes that a number of special terms from modern educational philosophy and practices appear throughout this Order. For the reader's ease, these terms are defined as follows:

"**At–Risk**" refers to "a pupil who, because of physical, emotional, socioeconomic, or cultural factors is less likely to succeed in a conventional educational environment." Colo.Rev.Stat. § 22–30.5–103(a). At-risk children may come from economically impoverished families, single parent families, and families that are culturally or linguistically different from the majority.

**Chapter I**, 20 U.S.C. § 2701 *et seq.*, is a federal program to provide financial assistance to schools to meet the educational needs of children. Chapter I students are considered at-risk students.

**Charter Schools** are public schools "under contract or charter to a public agency, governed by a combination of administrators, teachers, parents, and others. These schools offer a way to make public schools innovative, flexible and responsive to the needs of students and parents." Democratic Leadership Council, Charter Schools: A Handbook for Action, at 3 (1993).

**Colorado Association of School Boards** (CASB) has a pooled financing program that makes loans to school districts. In 1989, Pueblo School District 60 applied for and obtained a $26 million loan from CASB for capital improvements.

**Odyssey of the Mind** is a parent-sponsored enrichment program to teach students problem solving.

**Paideia Schools** are based on the teachings of Mortimer Adler, an educator and educational philosopher. A Paideia School does not segregate students based on ability (tracking) and concentrates on the arts and sciences to attempt to create an educational setting in which all students can succeed.

**Parents Resource and Involvement Strength Education** (P.R.A.I.S.E./Follow Through Program) is a federally-funded program designed to continue with students who participated in the Head Start Program. The school receives a three-year grant to establish programs for students and their parents. The program aims to intensify parental involvement in their children's education and provides parents with their own educational opportunities.

The **R & R (Restructuring and Reallocation) Fund** is a part of the District's General Fund. The District's Restructuring and Reallocation Task Force made a number of recommendations to save the District administrative and operating costs to be reassigned to educational purposes. Money in the R & R Fund comes from instituting the task force's recommendations.

3. The Alliance was incorporated in Colorado as a nonprofit corporation on November 4, 1991. The Alliance does not, however, own property or maintain bank accounts. In addition, the University of Southern Colorado and the District have observed all legal and financial formalities to maintain their separate and distinct status.

voted against closing the schools. Consequently, the voting lines were the same as for the charter school.

The School Board last closed schools in 1982, when it closed six school buildings. Since that time, enrollment in the District has fallen 1,400 students, or approximately 7.4%. However, over the last five years, enrollments have been relatively stable. Projections indicate that by 1998–99, the enrollments will fall an additional 4.1%.

In September of 1989, the District applied to participate in the Colorado Association of School Boards ("CASB") lease purchase pooled financing program. CASB loaned $26 million to the District for capital expenditures. In 1991, the District spent approximately $450,000 on renovating and upgrading Hyde Park elementary school. In addition to placing a new roof on the building, the District added a music room, a computer room, converted a teachers' workroom into a classroom, and added a classroom. Among other capital projects, the District also spent funds remodeling Irving Elementary ($300,-000), Fountain Elementary ($267,864), and built a new elementary school, Heritage ($3,320,444).

In July of 1991, the School Board approved a new strategic plan. In this plan, the District committed itself to autonomous, yet accountable schools operating within a decentralized environment. A goal of the plan was to further and support site-based decision making. As part of the strategic plan, the district appointed a task force, the Restructuring and Reallocation Task Force ("RRTF"), to review the administrative and operational functions of the District to further these ends. In its review of the District's operations, the RRTF did not study or review instructional activities. The RRTF issued a report in January 1992. Included in this report were projections that enrollment was expected to decline from 1981–82 through 1997 by 1,475 students. Noting that some schools had under-utilized capacity, the RRTF recommended that the District reduce annual operating costs through school closures and the disposal or sale of all buildings and properties that are not foreseeably needed.

Subsequent to the report and recommendations by the RRTF, the District appointed a Housing and Reconfiguration Committee in the Spring of 1992 to identify the savings and costs associated with school closures. The committee issued its initial report on December 14, 1992 and a revised report on January 9, 1993. The Housing and Reconfiguration Committee considered eight options, two of which involved school closures. Option Seven recommended closing Park View, Spann, Hyde Park, Bessemer, and Beulah Heights. The rationale for these closings was the schools were either too small or too costly to operate efficiently, under-utilized, or expensive to modify to meet the requirements of the Americans with Disabilities Act. Option Eight recommended closing Park View, Spann, Bessemer, and Hyde Park. All of the schools in Options Seven and Eight have enrollments whose majority are of Hispanic origin.

In May of 1993, the Board considered the recommendation of the Housing and Reconfiguration Committee to close Hyde Park, Spann, and Bessemer Elementary Schools. At that meeting, the Board conditionally voted to close Bessemer. The closure was conditioned on the District's creation of a Paideia alternative school the next year for grades second through twelfth. Bessemer students were to have the first opportunity to enroll. The administration was unable to meet the Board's condition, so Bessemer was not closed.

The District held elections for the School Board in November, 1993. Two incumbents did not run for reelection. Dennis Flores and Judy Weaver were elected to the School Board in their stead.

In September 1993, the University of Southern Colorado, submitted an application to sponsor the first charter school in the District pursuant to Colorado's Charter Schools Act. COLO.REV.STAT. § 22–30.5–101 *et seq.* The Board formally approved the application of PSAS in December 1993. PSAS will serve students in kindergarten through ninth grade. First year projected enrollment at PSAS is 323 students.

Colorado law provides that charter schools receive 80% of the per pupil state allocation. COLO.REV.STAT. § 22–30.5–112(2)(a). The remaining 20% goes to the district for administrative costs associated with the charter school. The District has allocated $125,000 towards capital improvements at Washington, the site of PSAS, and startup costs for PSAS. In addition, the District will be supplying PSAS with a variety of equipment, some of which will be coming from Hyde Park and Spann. The District is supplying PSAS with a building, Washington Elementary School, free of charge.

Pursuant to Colorado's Charter Schools Act, charter schools can obtain waivers of various laws that regulate the operations of other public schools. COLO.REV.STAT. § 22–30.5–105(6). Among others, PSAS has requested and received a waiver of Colorado's teacher certification requirements.

Admission to PSAS was open to all students regardless of ethnicity or past academic achievement. Hispanic groups publicized the school and encouraged parents to apply. Admission was on a modified first come/first served basis. The city was divided into eight separate zones. The process was done to ensure geographic and ethnic diversity, and to draw from parents and students interested in attending the school. The students attending the school reflect the ethnic diversity of the City of Pueblo. See V. Pueblo Charter School: Pueblo School for the Arts and Sciences, infra at 444.

In November 1993, the District formed an ad hoc committee to review the question of school closures. Serving as members of the committee were the following: (1) Jack Bay, administrative assistant to the Superintendent for budget and planning; (2) Martin Gonzales, director of pupil personnel; and (3) Theodore Bueno, administrator for instructional services. Mr. Gonzales and Mr. Bueno are Hispanic. The committee examined information regarding school utilization and costs. Included in the information the committee gathered is a projected loss of approximately 700 students by 1998–99.

In January and February 1994, the committee submitted to the Board guidelines for considering school closures and evaluation of school closures including: enrollment (present and projected), enrollment at nearby schools (present and projected), percentage of space utilized, and total cost per student. Other consideration included mobility (net transfers in and out during a school year), impact on programs, site and facility condition, and minority representation at schools. Eight schools were targeted for possible closure in 1994. Each of these schools has majority Hispanic enrollment.

On February 22, 1994, Henry Roman, Ph. D., Superintendent of the District, recommended to the School Board that Hyde Park and Spann Elementary Schools be closed effective the end of the 1994 school year. Basing its decision on declines in enrollment over the previous ten years, projections of further declines, and the goal of increasing efficiency, the School Board voted to close the two schools. The School Board did not consider the quality of educational programs at either Hyde Park or Spann, nor at any other school studied for closure. In addition, the Board did not perform an impact study concerning the effects that closing the schools might have on their surrounding communities.

Hyde Park Elementary School and Spann Elementary School experienced slight increases in enrollment in the 1993–1994 school year. Moreover, the neighborhoods surrounding Hyde Park and Spann are expected to experience a slight increase in population.

Hyde Park and Spann hosted a number of special programs. Both schools had schoolwide Chapter 1 programs. Because of these programs, the schools had pupil-teacher ratios that were lower than the District's average. In addition, both schools participated in federally-funded breakfast and lunch programs. Finally, Hyde Park was one of eighteen schools nationwide chosen to host a Parent Resource And Involvement Strength Education ("P.R.A.I.S.E.") program. This program is designed to continue activity with students who participated in the Head Start Program. The school receives a three-year grant to establish structured programs for students and their parents. Components of the program include the following: (1) medi-

cal, dental, and psychological support; (2) nutritional services; (3) parents are hired as classroom assistants; and (4) increased staff development for all school staff. The program aims to intensify parental involvement in their children's education and provides parents with their own educational opportunities. The three-year P.R.A.I.S.E. grant's federal funding ends after the 1994–1995 school year.

The majority of students who attended Hyde Park, approximately 211 students, will be bused to Irving Elementary School, which is approximately one mile away. To make space available for these students, approximately 44 Irving students will be bused to Fountain Elementary School. Students from Spann will attend Park View, Bradford, and Baca elementary schools. District policy is not to provide transportation to students who live less than a mile, approximately eleven city blocks, distance from their school. Some Spann students, who will be attending Park View Elementary, will have to cross Fourth Street and Eighth Street in walking to and from school. Both of these streets carry large amounts of traffic and present potential dangers to young children. Eight teachers from Hyde Park are scheduled to teach at Irving Elementary School. Similarly, eight teachers from Spann will teach at the receiving schools.

During 1993, the Hispanic enrollment at Hyde Park was 74.52%. At Spann, the enrollment was 77.53% Hispanic in 1993. At Irving, 65.25% of the students were Hispanic. At Baca, Bradford, and Park View, the Hispanic enrollments in 1993 were respectively 78.54%, 83.39%, and 76.88%. Testimony indicated that the percentages of Hispanic enrollment would not change appreciably at the receiving schools due to the closure of Hyde Park and Spann.

The District has estimated that it will save approximately $327,000 annually from the two school closures. These savings arise from reduced administrative staff, including principals, clerical personnel, a media supervisor, and custodial help. Savings will also be realized from reductions in maintenance and utility costs. This figure does not include the cost of the closures. These savings will be placed in the District's R & R funds. R & R funds are a part of the general funds. The R & R fund currently has in excess of four million dollars. Part of the R & R funds are allocated to each school to spend as it sees fit. The District has reserved one million dollars for administrative expenses. From its one million dollar portion, the district has allocated money to PSAS for start-up costs. This money is a portion of PSAS's 80% allocation of state funds.

## III. DISCUSSION

■ Taken individually, or in their totality, Plaintiffs' contentions do not warrant overturning the School Board's decision, which was made on a legitimate and valid basis. In our view, the closure decisions were not a facade or subterfuge to benefit PSAS. Moreover, the School Board did not intend to discriminate against Hispanic students. In closing Hyde Park and Spann, the School Board was not acting to further a hidden improper agenda. Furthermore, Plaintiffs' have failed to establish that the decision to close these schools will have a discriminatory impact on Hispanic students. In this regard, the Court will not second guess the School Board's decision.

In reaching the decision to close Hyde Park and Spann, the School Board and the administration of the District performed numerous, detailed studies. They looked at information regarding enrollments and enrollment trends. They also considered issues of efficiency and optimum usage of the District's resources. The School Board attempted to apply business principles in their management of the District. In this connection, we parenthetically note that the operation of a school district is a business, but it must be a business with a heart.

In reaching its closure decision, the School Board relied on the information provided to it by the District's Administration. That information drew comparisons between schools based on the utilization of space and per pupil costs for administrative and other services. In relying on these calculations, it appears that the School Board did not carefully consider the impact of the closures on the parents and children of Hyde Park and

Spann—the human side of closures. However, this oversight does not warrant invalidating the School Board's actions.

■ Several witnesses testified that under almost no circumstances should neighborhood schools be closed absent a structural or building catastrophe. This testimony is not persuasive. The School Board has a fiduciary duty to the District to act with fiscal responsibility. The School Board does not need to wait until the District is in the midst of a financial crisis to act. It is appropriate that the School Board did strive to improve District efficiency and utilization of resources.

Based on their testimony, it appears that the School Board members and District administrators are well-intentioned, sincere, and acted with a dedication of purpose—to improve the quality of education in Pueblo School District 60. The principals and teachers of the District who testified, through their caring and commitment, represent education at its best.

The Court is impressed with the resolve of the Plaintiff parents to encourage, support, and participate in the education of their children. These parents seek to have their children receive the best education possible. Towards that end, these parents are striving to ensure that their children retain the benefits of programs, including: Chapter I, P.R.A.I.S.E., after-school programs, summer activity programs, and lunch programs. The parents' concerns go not just to the continuation of the programs at the schools to which their children are being transferred, but also to whether their children will be able to get to school to participate.

We do not see ourselves as omnipotent, and we do not sit as a super-school board or an all-knowing parent.[4] However, after hearing the concerns raised by the witnesses, it is within our judicial responsibility to offer some recommendations for the consideration of the School Board and the District. The recommendations are detailed with the view

that transition of the students into the new schools may be accomplished without unnecessary upheaval. It is in this spirit we offer our recommendations.

## IV.  RECOMMENDATIONS

### A.  Summary of Recommendations

1.  Parents, District administrators, School Board members, and teachers must work together to provide the best educational experience possible for students;

2.  The District needs to provide safe transportation for students;

3.  Enrichment programs, like Odyssey of the Mind, must continue at levels existing prior to the school closures or expand, and students must receive the benefits of all programs to which they are entitled without any reduction in class time;

4.  The District needs to apply available transportation resources to help the Hyde Park and Spann parents maintain involvement in their children's education and the P.R.A.I.S.E. Program;

5.  The District should establish a Community Wide Council to develop ways for the District to enhance parental involvement, increase and improve relations between the District and the community, and to ensure that parental concerns are being addressed;

6.  The District should designate a key person at each school to implement programs to enhance parental involvement and ease the transition period; and

7.  The District and PSAS administrators need to alter the application process and procedures to ensure that no parents are impeded or dissuaded from applying to the school.

### B.  Parental Involvement

Successful education requires the joint effort of students, teachers, parents, administrators, and the School Board. Confrontation and rancor, rather than cooperation and

---

4.  In enunciating our views, the Court has attempted to adhere to the principle eloquently stated by Justice Jackson and to refrain from allowing "zeal for our own ideas of what is good in public instruction to induce us to accept the role of a super board of education for every school district in the nation." *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 237, 68 S.Ct. 461, 477, 92 L.Ed. 649 (1948).

goodwill, governed the interactions between the School Board and the parents. The School Board and administration have not used these parents as the resource that they are; however, the Court believes it is not too late for the District to avail itself of these parents' energy and commitment to make the transfer schools even better than Hyde Park or Spann.

The Court recognizes that the District has made some efforts to reach and address the concerns of the parents. In this regard, staff members will not lose employment as a result of school closings. Special efforts will be made to continue strong parental involvement through combining Parent–Teacher organizations, site councils, and other committees. The District will transfer programs and federal funding to the new schools. Finally, the District is attempting to find positive uses for the buildings at Hyde Park and Spann.

In spite of these efforts, the Court has concerns that the District must address during the transition period. The District must make substantial and material efforts to enable and facilitate these parents' active participation in their children's education. Parental participation at Hyde Park and Spann was extensive. The District has the opportunity to harness parents' commitment for the good of the transfer schools.

Jack Weldon, the Transportation Supervisor for District 60, testified in his deposition that of the District's 54 buses, only 41 are used on a daily basis. In addition to their present use for daily pupil transportation, field trips, and emergencies, the District should consider using buses for transporting interested parents from the Hyde Park and Spann areas to and from school for evening programs. Fostering continuing parental involvement would ease the transition to the new schools for their children. In addition, parental involvement improves education and community relations and support for educational objectives in the District.

### C. Benefits and Programs

The District must also ensure that the children will receive all of the benefits to which they are entitled. The Chapter I and P.R.A.I.S.E. programs must be maintained in full force with emphasis on serving the needs of the children and parents from Hyde Park and Spann. The District has pledged additional resources to expand the P.R.A.I.S.E. program to include all of the parents and students at Irving. The Court believes that this program can have a positive impact on children and parents, and the District should carefully consider financially and administratively supporting the program.

The District has stated that the seven parents hired as teachers' aides under the P.R.A.I.S.E. grant will continue in those roles at Irving. In addition, the District has stated that it will hire an additional seven parents to serve similar roles. These parent assistants should be integrated into the P.R.A.I.S.E. program without regard as to the source of funding, so that all are commonly supervised and divisiveness does not occur. To ensure the continuing success of these programs, it is recommended that the District should designate a hub person, perhaps the current program director, who is knowledgeable with the community and who can address the program's needs at the highest levels.

Part of the P.R.A.I.S.E. grant provides educational opportunities for parents. Where feasible, the District should coordinate carpooling and other transportation, so parents can continue to avail themselves of the program. In addition, the District should attempt to make the parents' room at Irving a resource rich and inviting room. Parents must be permitted to use this room as they see fit, including use for the entire day.

One area in which parental involvement can be helpful is in the transfer and establishment of Odyssey of the Mind programs at the receiving schools. Odyssey of the Mind is a wholesome program, with heavy parental activity that attempts to teach short-term and long-term problem solving to children. The program involves students in "mental gymnastics" to improve their reasoning abilities. Administrators should contact those parents who helped with these programs at Hyde Park and Spann to obtain their help in

continuing the programs at the receiving schools.

Children must also continue to receive their breakfast and lunch benefits. In addition, the District must ensure that the receipt of such benefits do not negatively impact the amount of time that students spend in the classroom. To that end, the Court suggests that the receiving schools follow the example set by Bradford Elementary in moving the time classes start to 8:45 a.m. This way, the bused students arriving at 8:30 a.m. may have breakfast without a loss of classroom instructional time. The District must also strive to ensure that summer activity and lunch programs are accessible to all students assigned at a given school. This means that the District should explore the use of buses or other transportation to students year round to enable them to attend these important summer programs.

### D. Transportation and Safety

The District needs to consider actions to ensure that children will reach school safely. Children from Hyde Park are separated from their new school by regularly-used railroad tracks. For a child missing the bus, or having to walk to school for other reasons, these tracks pose a serious threat to their safety. This threat persists in spite of elevated crossovers above the tracks because a young child might not appreciate the danger of crossing the tracks, or might not want to take the extra time and effort the crossovers require.

For students formerly attending Spann, walking to their new school may entail traversing up to eleven city blocks. This approximately mile-long walk involves crossing two busy streets, Fourth Street and Eighth Street. In winter, the distance through cold and possibly icy conditions might very well increase the danger.

The District should analyze the potential threats to students and take measures to address and minimize the risks to the students including safety education and programs to inform students of potential dangers.

### V. PUEBLO CHARTER SCHOOL: PUEBLO SCHOOL FOR THE ARTS AND SCIENCES

Based on testimony and applicable law, the Court is of the view that there is no basis to invalidate the implementation of the Charter Schools Act in Pueblo. It appears that PSAS will provide an opportunity for innovation and alternative educational experience for some children. Under the curriculum at PSAS, students will receive instruction in the arts (dance, theater, music, visual arts, and creative writing), foreign language, language arts, mathematics, natural science, social science, and physical education. PSAS requires that parents commit eighteen hours a year to helping the school in some way. Similarly, students at PSAS must commit one hundred hours to community service as a requirement for graduation. All students will participate in the same classes regardless of level; there will be no tracking by ability. Finally, the ultimate goal of PSAS is to provide a seamless education from kindergarten through college, so learning and curricula will be established in a logical progression. There is a cap on the number of students who can attend the school.

Innovation and experimentation in education are critical and legitimate purposes for the District. It appears that PSAS will be used as a model program so that successful techniques and methods will be incorporated into the general District Curriculum. However, there are legitimate concerns, addressed below, regarding the application process.

### VI. JOINING FORCES

During the course of the five days of hearings, the Court heard testimony from the members of the School Board, administrators, parents, educators, and experts. Each of these witnesses was generally experienced, knowledgeable, sensitive and caring about the children and the District. The court did not hear from any children. Were a child to have testified, the Court has no doubt but that the child would have expressed concern for a safe environment, interested teachers, and an end to the friction between the School Board, administration, and parents. All of

the parties must begin to work together to advance the best interests of the children.

To assist the parties towards this end, the Court refers the parties to the Community Relations Service Department of the United States Department of Justice. The Department has had success in the past at working with parents and school districts to resolve problems. *See Duran v. Center Consolidated School District 26 JT,* No. 85–F–2736 (D.Colo. October 2, 1986). In *Duran v. Center Consolidated School District 26 JT,* emotions were equally as high as those in this action. Every community resource should be marshalled and deployed to defuse the tensions and proceed with providing the best education possible for these children. To accomplish this, the Court trusts that the District and the parents will cooperate with the Community Relations Service Department and make use of the Department as a resource to aid in smoothing the transition and helping to solve problems as they develop in the transition process.

The Court further recommends that the District establish a Community Wide Council to be composed of interested parents, a School Board Representative, a representative of the District's Administration, and community representatives. *See generally,* James P. Comer, M.D., *Educational Accountability: A Shared Responsibility Between Parents and Schools,* 4 STAN.L. & POL'Y REV. 113 (1992/1993). The purpose of this Council can be to enhance parental involvement, to increase and improve relations between the District and the community, and to ensure that parental concerns are being addressed. In addition, the District should carefully consider designating one key person at each school to implement programs to enhance parental involvement and ease the transition period.

There is no clear victor and no one is vindicated by our decision in this Court Order. Only one objective should be at issue, the best education for the children. All should be united in this objective. Children are this country's greatest natural resource. Every effort must be marshalled to assist these children in their educational objectives and to ensure that they will be sound contributors who benefit themselves, their families, communities, and the nation. As Horace Mann stated, "If we do not prepare children to become good citizens; if we do not develop their capacities, if we do not enrich their minds with knowledge, imbue their hearts with love of truth and duty, and a reverence for all things sacred and holy, then our republic must go down to destruction." [5]

## VII.  LEGAL ANALYSIS

### A.  Standard for a Permanent Injunction

Plaintiffs argue that Defendants' decision to close Hyde Park and Spann will have an immediate irreparable and adverse disparate impact on Plaintiffs, children between the ages of five and twelve and their parents. Moreover, Plaintiffs assert that Defendants' constantly shifting reasons for the school closures belie the discriminatory nature of their arbitrary and irrational actions under color of law which cannot withstand the heightened scrutiny required in actions adversely affecting the equal protection rights of a protected minority.

The general basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975). A court of equity should consider the public consequences in employing the extraordinary remedy of injunction. *Weinberger,* 456 U.S. at 312, 102 S.Ct. at 1803; *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). The Tenth Circuit Court of Appeals has established four factors that the moving party must demonstrate in order to obtain a preliminary injunction. *Tri–State*

---

**5.**  Horace Mann (1796–1859), noted educator and lawyer, played a leading part in establishing the elementary school system of the United States. He succeeded in arousing public interest in educational problems. He summed up his great desire to serve mankind in his last public statement. "Be ashamed to die until you have won some victory for humanity." THE WORLD BOOK ENCYCLOPEDIA, 1965.

*Generation v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986). The moving party must demonstrate the following: (1) that it will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause to the opposing party; (3) issuance of the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will prevail on the merits. *Id.; accord Equifax Services, Inc. v. Hitz,* 905 F.2d 1355, 1360 (10th Cir. 1990).

█ This Court has rephrased the test using the following as the main factors to consider: (1) the probability of success on the merits; (2) whether the injunction will maintain the status quo or change it; (3) whether irreparable injury will result absent an injunction; (4) whether there is an adequate remedy at law; (5) the degree of hardship to the opponent; and (6) whether the equities are in the movant's favor. *National Ass'n of Psychiatric Treatment Ctrs. v. Weinberger,* 661 F.Supp. 76, 79 (D.Colo. 1986); *Royal Crown Bottling Co. v. Royal Crown Cola Co.,* 358 F.Supp. 290, 294 (D.Colo.1972).

█ The Tenth Circuit Court of Appeals has adopted a liberal definition regarding the probability of success on the merits requirement. "When the other three requirements for a preliminary injunction are satisfied, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Savings & Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275, 278 (10th Cir.1981). For a permanent injunction to issue, however, the Plaintiffs must actually demonstrate success on the merits. *Amoco Production Company v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). Implicitly, the standards for a permanent injunction are less demanding than those of a preliminary injunction. *Durango Herald, Inc. v. Riddle,* 719 F.Supp. 941, 946 (D.Colo.1988). The Court applies an actual burden of proof to the claims rather than speculating about the movant's ultimate ability to meet that burden. *Durango,* 719 F.Supp. at 946.

█ In the instant action, the Court concludes that Plaintiffs' request for injunctive relief fails. As discussed below in detail, Plaintiffs do not succeed on the merits of their claims. Plaintiffs also have not shown that they will be irreparably injured from the closure of Hyde Park and Spann or from the opening of PSAS. In addition, after careful consideration of the litigants' concerns and the relative hardships, the Court finds that the equities are equally balanced. Consequently, Plaintiffs are not entitled to an injunction as concerns either the closures of Hyde Park and Spann or the opening of PSAS.

### B. Constitutional Challenges

Plaintiffs argue that the decision to close Hyde Park and Spann discriminates against Hispanics. In addition, Plaintiffs assert that the decision to open the charter school using these resources violates Plaintiffs' equal protection rights.

### 1. Challenge to the Charter Schools Act

█ The Court previously dismissed Plaintiffs' challenges to Colorado's Charter Schools Act brought pursuant to the State of Colorado's Constitution. The Court does not believe that we should interpret the state's organic law until the state's courts have addressed the issue. Plaintiffs' reasonable challenge to the Charter Schools Act under the United States Constitution remains in this action. After careful consideration, the Court finds no constitutional infirmity of the Act as concerns the United States Constitution.

Plaintiffs assert that the Charter Schools Act violates the Equal Protection Clause of the United States Constitution. Specifically, they claim the following: (1) the Act permits gross disparities in per pupil expenditures; (2) the Act permits gross disparities in the quality of programs and curriculum; (3) the Act permits use of tax revenues of district citizens for a school not subject to the rules, regulation, and curriculum of the district; (4) the Act allowed the District to close two

ordinary schools, with large percentages of Hispanic students, and to reapply funds generated by the closing for the charter school; (5) the Act, as applied by the District, permits an application process which discourages applications from minority student members; (6) the creation of the charter school in Pueblo has and will drain resources from District schools, and this loss will be felt disproportionately by Pueblo's Hispanic students; and (7) because of PSAS's application process, few Hispanic students will be benefitted, but many will be harmed. Plaintiffs contend that even under a rational basis analysis, separating pupils into two groups and singling out one group for more resources, a superior curriculum, higher standards, and unlimited fund raising potential serves no legitimate purpose.

Charter school legislation has been enacted in at least eight states and ten other states are considering enacting similar legislation. These schools are one manifestation of a national trend to encourage innovation in education. In addition, charter schools also represent a trend towards experimenting with privatization of traditional governmental functions. In essence, a charter school is a cross between a public and a private school. This status is exemplified by the fact that charter school legislation requires a contract, which governs administration of the school, between the school and a government entity. Two charter schools operated in Colorado during the 1993–94 school year; twelve additional charter schools are scheduled to open for the 1994 school year, and three more charter schools are scheduled to open for the 1995 school year. Three of Colorado's charter schools mention serving at-risk pupils explicitly as part of their charter.

### 2. Equal Protection

■ In determining the federal constitutionality of Colorado's Charter Schools Act, the Court begins with the presumption of constitutionality. *National R.R. Passenger Corp. v. Atchison, Topeka, and Santa Fe Ry. Co.,* 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985); *United States v. Agnew,* 931 F.2d 1397, 1404 (10th Cir.), *cert. denied,* 502 U.S. 884, 112 S.Ct. 237, 116 L.Ed.2d 193 (1991). As the party attacking the constitutionality of the Act, Plaintiffs must demonstrate that the Act is unconstitutional beyond a reasonable doubt. *Giebink v. Fischer,* 709 F.Supp. 1012, 1017 (D.Colo. 1989). Where the state presents a plausible construction of the Act that would result in a finding of constitutionality, the Court must accept that construction. *Commodity Future's Trading Comm'n v. Schor,* 478 U.S. 833, 841, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986).

■ To make out a prima facie case of discrimination under the Equal Protection Clause of the United States Constitution, Plaintiffs need to show more than disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Plaintiffs must prove discriminatory intent or purpose to establish a violation of the Equal Protection Clause. *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

In *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563, the United States Supreme Court stated, "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing [policy] appears neutral on its face." Plaintiffs contend that the decisions to close Hyde Park and Spann can only be explained on grounds of their ethnic origin. In support of their position, Plaintiffs' argue that (1) past enrollment declines are not a reasonable basis to close the school; (2) current enrollments are stable; (3) the District spent $430,000 in CASB funds renovating Hyde Park; (4) classes at the receiving schools will be overcrowded and the Pupil Teacher Ratio in the receiving schools will exceed the limits required by Chapter I; (5) the District's desire to maintain the ethnic balance of the receiving schools is facially discriminatory; and (6) the overall favored status afforded PSAS all combine to show a pattern of conduct that can only be explained as being based on racial discrimination.

■ In our view, persuasive evidence at trial does not support this conclusion. Con-

**448**

trary to Plaintiffs' contentions, enrollments have generally fallen, and the buildings are underutilized even though last year's enrollment for each building increased slightly. As concerns the expenditure of CASB funds to renovate Hyde Park, sometimes governments act irrationally, especially when there is limited long-range planning. This does not warrant invalidating the School Board's decision. Because other programs or students will be moved, the receiving schools will not be overcrowded.[6] In addition, the District is modifying the receiving schools to accommodate the additional students. The District-wide average Pupil Teacher Ratio of 25:1 will be maintained. The District has ensured that the Pupil Teacher Ratio in the receiving schools will not exceed the limits (22:1) required under the Chapter I program. In selecting the receiving schools, the District's desire to keep children from the same neighborhoods together and to minimize busing and travel time. Finally, Plaintiffs' attempts to link the decisions to close Hyde Park and Spann with the decision to open PSAS are tenuous at best. In sum, the Court finds that Plaintiffs have not established the requisite intent to discriminate. There is no evidence that any of the members of the School Board or administration had any intent whatsoever to discriminate against Hispanics in closing Hyde Park and Spann or in the opening of PSAS.

■■■■ The Court notes that education is not a fundamental right. *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). Because the Charter Schools Act is facially neutral and does not implicate a fundamental right, the Act will be reviewed under a rational relationship test. Colorado has stated a number of purposes for enacting its Charter Schools Act. Specifically, the Colorado legislature stated:

In authorizing charter schools, it is the intent of the general assembly to create a legitimate avenue for parents, teachers, and community members to take reasonable risks and create new, innovative, and more flexible ways of educating all children within the public school system. The general assembly seeks to create an atmosphere in Colorado's public school system where research and development in developing different learning opportunities is actively pursued.

COLO.REV.STAT. § 22–30.5–102(3). Colorado has a legitimate governmental interest in encouraging innovation in education. The Charter Schools Act is rationally related to such an interest.

■■■■ Plaintiff argues that COLO.REV. STAT. § 22–30.5–109 violates the United States Constitution by establishing a dual school system. Section 22–30.5–109(2)(a) limits the number of charter schools to fifty and provides that at least thirteen of those schools are to increase the educational opportunities of "at-risk" students. The Act defines "at-risk pupil" to mean "a pupil who, because of physical, emotional, socioeconomic, or cultural factors, is less likely to succeed in a conventional educational environment."[7] COLO.REV.STAT. § 22–30.5–103. Although Hispanics are a protected class, "at-risk" status does not constitute a protected class because students are not treated differently because of their race, national origin, or status as aliens. Encouraging the development of Charter Schools to address the needs of at-risk students does not warrant heightened scrutiny and does not violate the Equal Protection Clause of the United States Constitution.

■■■■ Plaintiffs have attempted to show that the School Board closed Hyde Park and Spann to free money to be used to fund PSAS. Plaintiffs have failed to convince the Court that the two decisions are related.

---

**6.** Plaintiffs' Exhibit 62 indicates that when the transfer students are added to enrollments at the receiving schools, the schools' capacities were exceeded. The testimony of Henry Roman, Ph. D., indicated that the numbers in this exhibit were optimum capacity, ten percent below maximum capacity. Using these figures, the receiving schools will not exceed their capacity.

**7.** "At risk" is a term of new parlance. At risk students are found not only in Pueblo, but also in every town, city, and state in the nation and throughout the world.

First, the decisions are separated by a two-month time gap. The vote to close the schools occurred in December, 1993, and the vote to open PSAS occurred in February, 1994. Second, every School Board Member testified that even were the Court to enjoin the closing of Hyde Park, they would still vote in favor of the charter school. Third, no legal basis has been presented to the Court to show grounds upon which the School Board could have voted against the Charter School Application. Fourth, money saved from the closure of Hyde Park and Spann will go to the R & R fund, a part of the District's General Fund, and all schools have access to a portion of those funds. Finally, although a hefty portion of the funding for PSAS have been allotted from the R & R fund and PSAS has enjoyed unparalleled ease of access to its portion, this is not enough to show an unconstitutional link between the decisions to close Hyde Park and Spann and the decision to open PSAS.

██ Plaintiffs also challenge the admission policies and procedures of PSAS. Although the Court agrees with Plaintiffs that many of these practices lack some aspects of fairness, the Court does not find any Constitutional violations. Plaintiffs have presented evidence that PSAS, because of its admission policies and procedures, discriminates on the basis of socioeconomic class. Socioeconomic class is not a protected class under the Constitution. *San Antonio Indep. School Dist.*, 411 U.S. at 33, 93 S.Ct. at 1296. The Court, however, sitting in equity recommends that

PSAS take remedial actions in future admissions to alleviate potential biases and unfair practices from the process.[8]

Acceptance to PSAS was on a modified first come/first served basis. The city was divided into zones, so priority for admission depended on both grade and zone. This means that each zone had its allotment for each grade level. If one grade level filled up for a given zone, additional applicants for that grade level would be placed on a waiting list. The District established two days, Saturday, March 12, 1994, and Saturday, March 19, 1994, on which parents could submit their applications. On those days, applications were accepted from 10:00 a.m. to 5:00 p.m. and 10:30 a.m. to 5:30 p.m. respectively. One of the most troubling practices in the admissions process was that some parents camped out in line so as to be the first to submit applications. Although not rising to the level of a constitutional violation, allowing these parents to gain a special advantage violates traditional notions fair play and equitable conduct.

Plaintiffs challenge the application form to PSAS because of some of the questions it asks. The application requires parents to divulge their place of employment. Testimony reflected that this sort of question may deter people who are unemployed from applying, and that there is no useful purpose for this information before the child has been accepted. It appears that the information can be collected equally easily after acceptance.

8. The Court is cognizant of Plaintiff's Exhibit 103 setting forth some of the demographics of some of the students who were accepted to PSAS. As concerns the father's employment (based on the 78% of the children whose fathers listed their employment):

15 are the children of business owners, 17 are the children of employees of Department of Corrections, 9 are the children of CMHIP employees, 7 are the children of . University of Southern Colorado professors/employees, 3 are the children of District 60 employees, 2 are the children of a District Court Judge, 2 are the children of lawyers, 8 are the children of city employees, 9 are the children of CF & I/Oregon Steel employees, 2 are the children of dentists, 3 are the children of a minister, 1 is the child of a District 60 teacher.

As concerns the mother's employment (based on the 76% whose mothers listed their employment):

16 are the children of District 60 employees/teachers, 5 are the children of Pueblo Community College employees/teachers, 8 are the children of University of Southern Colorado professors/employees, 6 are the children of St. Mary/Corwin employees, 8 are the children of Park View employees, 22 are the children of self-employed mothers, 2 are the children of a psychologist, 6 are the children of business owners, and 44 are the children of full-time homemakers.

It is unclear from this data whether the accepted students' socioeconomic class is proportionate to the demographics of Pueblo. Expert testimony indicated that the application process and forms might dissuade certain economically disadvantaged families from applying to PSAS.

Plaintiffs also challenge the application for stating that a interview with parents is required prior to admission. In contradiction to the form, Defendants testified that the actual practice was to conduct post-acceptance interviews. Defendants further testified that acceptance was not conditioned upon the interview, and that no interviews in actuality took place outside of group meetings. Although not finding a violation of constitutional proportions, the Court agrees with Plaintiffs that a pre-acceptance interview requirement is intimidating and might dissuade people from applying. Because the actual District practice was not to conduct interviews at all, the Court suggests that information regarding an interview requirement be removed from the application forms.

The Court notes that by virtue of PSAS's application process, the school will open with a student body that is 53% Hispanic and overall 63% minority in enrollment.[9] Although these enrollment percentages reflect the general ethnicity of students enrolled in the District (50% Hispanic, 2% African–American, 1% Asian American), there must be concern about enrollment in future years. For this reason, PSAS should change its application form and information materials to inform parents and students of the commitment requirements. PSAS can gather the information it needs after children have been accepted.

### 3. Due Process

■ Plaintiffs also allege that their rights to due process of law under the Fourteenth Amendment of the United States Constitution have been violated. Plaintiffs allege that the following property rights are involved: (a) deprivation of Schoolwide Chapter I benefits; (b) deprivation of the benefits of the P.R.A.I.S.E./Follow–Through Program; and (c) deprivation of property interest in school lunch and breakfast program.

The evidence has shown that access to these programs remains fully available to Plaintiffs and their children. Because these programs will remain available, there has been no deprivation. As Plaintiffs have

failed to show that there is· or will be a deprivation, Plaintiffs have not made out a prima facie case. Consequently, their claims brought pursuant to the Due Process Clause of the United States Constitution fail.

### C. Title VI of the Civil Rights Act of 1964

Title VI protects the right to be free from discrimination under a program receiving federal funding. 42 U.S.C. § 2000d *et seq.* Plaintiffs argue that the decision to close Spann and Hyde Park, two Chapter I schools, substantially defeats the objectives of Chapter I. Plaintiffs also argue that the Charter Schools Act violates the principles of *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) in creating a dual school system.

Pursuant to Title VI, discriminatory impact even absent proof of discriminatory intent suffices to support Plaintiffs' claim. Plaintiffs have the initial burden of showing disparate impact. Defendants then have the opportunity to present a substantial legitimate justification for their actions. *See Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d 1403, 1417 (11th Cir.1985). Defendants contend that even if there is a disparate impact, there is substantial legitimate justification for the decision to close the schools. *See Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1413 (11th Cir.1993) (closing and consolidating underutilized schools substantially justified); *Harris v. Crenshaw Cty. Bd. of Educ.,* 968 F.2d 1090, 1095 (11th Cir.1992) (consolidation of schools upheld where dramatic reduction in enrollment; additional ten mile bus ride not a Title VI violation).

■ Plaintiffs have failed to show discriminatory impact. Hyde Park and Spann had enrollments of students the majority of whom are Hispanic. The schools to which these students are assigned have enrollments the majority of whom are Hispanic. In fact, Hispanics comprise the majority of students enrolled in the District. Plaintiffs have failed to demonstrate how they will be dis-

---

**9.** The Court notes that Plaintiffs' analysis resulted in similar figures to conclude that 47% of the enrollment was Hispanic.

criminatorily impacted. Because no benefits will be lost, and there is no evidence to suggest that Plaintiffs will receive an inferior education at their new schools, Plaintiffs have not shown that they will be harmed.

As noted, the School Board had a legitimate basis for its decision to close the schools. Both Hyde Park and Spann had available instructional space. Population and enrollment trends support the action taken by the School Board. The Court further finds that there is an economic basis to support the closing of these schools. Underutilization of school buildings and the need to reduce administrative expenses are legitimate, non-discriminatory reasons for the School Board's actions. Consequently, Title VI was not violated.

### D. Equal Educational Opportunities Act

■ The Equal Educational Opportunities Act, 20 U.S.C. § 1701 *et seq.,* provides that it is the policy of the United States that all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin. In addition, the neighborhood is the appropriate basis for determining school assignments. Plaintiffs allege that Defendants are creating a two-tiered school system that deprives Plaintiffs of equal educational opportunities. In addition, Plaintiffs allege that Defendants are violating the Equal Educational Opportunities Act because reassigned students are subjected to a long and dangerous walk or unnecessary busing.

Defendants respond that the rights and remedies afforded under Title VI are coextensive with those under the Equal Educational Opportunities Act. *See Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d at 1422 n. 34. Plaintiffs therefore have the initial burden of showing disparate impact. Defendants then have the opportunity to present a substantial legitimate justification for their actions.

As discussed above in regard to Plaintiffs' Title VI claim, the Court has not found any evidence to support a claim of disparate impact. In addition, Defendants have advanced a legitimate justification and basis for their actions. Therefore, Plaintiffs' claims brought pursuant to the Equal Educational Opportunities Act fail.

### E. Denial of Parental Involvement in Schools

Pursuant to the Elementary and Secondary School Improvement Act Amendments, 20 U.S.C. § 2726, local educational agency funding is contingent upon parental involvement programs. Plaintiffs contend that closure of the schools will effectively end parental involvement. Section 2726 of Chapter I, in relevant part provides:

(1) Congress finds that activities by schools to increase parental involvement are a vital part of program under this division.

(2) Toward that end, a local educational agency may receive funds under this division only if it implements programs, activities, and procedures for the involvement of parents in programs assisted under this division. Such activities and procedures shall be planned and implemented with meaningful consultation with parents of participating children and must be of sufficient size, scope, and quality to give reasonable promise of substantial progress toward achieving the goals ... of this section.

Defendants argue the claim must be dismissed because 20 U.S.C. § 2701 does not create a private cause of action for parents against a school district.

■ There is a four-part inquiry for inferring a private cause of action: (1) is Plaintiff a member of the class for whose especial benefit the statute was enacted; (2) is there any indication of legislative intent to create such a remedy; (3) would such a remedy be consistent with the statutory scheme; and (4) is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law. *Cort v. Ash,* 422 U.S. 66, 78,. 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).

■ The Court finds that there is no private cause of action pursuant to 20 U.S.C. § 2726. Congress did not enact this section to benefit parents, but rather for the benefit of their children. Consequently, parents are

**452**

not members of the class for whose benefit the statute was enacted. In addition, there is no indication of legislative intent to create such a remedy for children to bring suit through their parents. The Title I program, of which 20 U.S.C. § 2726 is a part, is a federal grant program to aid at-risk pupils. Under this program, the Secretary of Education and the states are given regulatory and enforcement powers. *See* 20 U.S.C. §§ 2831–2836. No provision in the Title I programs provides individual citizens with enforcement powers. The Court can see no clear benefit from allowing a private cause of action under the statutory scheme. In addition, no legal precedents have come to our attention allowing a private cause of action, and the Court, after extensive research, has not located any such precedents. Plaintiffs do not, therefore, have a cognizable claim pursuant to 20 U.S.C. § 2726.

### VIII. CONCLUSION

The Court commends the parents, administrators, educators, and the School Board members for their sincerity and dedication to providing children with a quality education. The District should seek to ensure that all benefit programs continue in full force. The District needs to consider carefully providing outreach and assistance to continue and enhance parental involvement. The District and administrators of Pueblo School for the Arts and Sciences must rethink its admission policies and procedures of PSAS to remove biases and impediments so that no one is discouraged from applying. Parents need to redouble their efforts to involve themselves in their children's education. To aid in the healing process and for the best interest of the children, the parties are referred to the assistance of the Community Relations Service Department of the United States Department of Justice.

This Memoranda Opinion and Order constitutes our findings of fact and conclusions of law.

### IX. ORDER

ACCORDINGLY, it is ordered that:

(1) The issues are found in favor of Defendants and against Plaintiffs;

(2) Plaintiffs' *Motion for a Permanent Injunction* is DENIED;

(3) The Clerk of the Court is directed to enter judgment in favor of Defendants Warren Carere, Dennis Flores, Mary Lou Jackson, Abel Tapia, Judy Weaver, and the Board of Education for Pueblo School District No. 60 and Intervenors the State of Colorado and the Colorado State Board of Education and against Plaintiffs;

(4) The Complaint and cause of action are DISMISSED;

(5) Each party shall bear its or their own costs; and

(6) In light of our ruling herein, the motions for entry of judgment and for summary judgment filed by Defendants and Intervenors State of Colorado and Colorado State Board of Education are moot.